[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 29, 2011
JOHN LEY
CLERK

_____

No. 10-13654

_____

D.C. Docket No. 7:07-cr-00448-LSC-HGD-1


UNITED STATES OF AMERICA,

                                              Plaintiff - Appellee,

                         versus

GARY L. WHITE,

                                              Defendant - Appellant.


_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(November 29, 2011)

Before TJOFLAT and CARNES, Circuit Judges, and MICKLE,* District Judge.

_____

   * Honorable Stephan P. Mickle, United States District Judge for the Northern District of
Florida, sitting by designation.

CARNES, Circuit Judge:

"Kleptocracy" is a term used to describe "[a] government characterized by rampant greed and corruption." The American Heritage Dictionary of the English Language 968 (4th ed. 2000); see also New Oxford American Dictionary 963 (3d ed. 2010); Random House Webster's College Dictionary 724 (2d ed. 1998). To that definition dictionaries might add, as a helpful illustration: "See, for example, Alabama's Jefferson County Commission in the period from 1998 to 2008." During those years, five members or former members of the commission that governs Alabama's most populous county committed crimes involving their "service" in office for which they were later convicted in federal court. And the commission has only five members. One of those five former commissioners who was convicted did not appeal.[1] We have affirmed the convictions of three others who did.[2] This is the appeal of the fifth one.

---

[1]Judgment, United States v. Buckelew, No. CR 08-J-357-S (N.D. Ala. Nov. 20, 2009) (Mary Buckelew's conviction for obstructing an official proceeding).

[2]See United States v. Langford, 647 F.3d 1309 (11th Cir. 2011) (Larry Langford's convictions for bribery, conspiracy, money laundering, mail fraud, wire fraud, tax fraud, and criminal forfeiture); United States v. McNair, 605 F.3d 1152 (11th Cir. 2010) (Chris McNair's convictions for conspiracy and bribery); United States v. Germany, 296 F. App'x 852 (11th Cir. 2008) (Jeff Germany's convictions for conspiracy and misapplication of government funds).

Another former member of the county commission was convicted in federal court for stealing money that the county, among others, gave to a charity he ran ostensibly to help underprivileged children. See United States v. Katopodis, 428 F. App'x 902 (11th Cir. 2011) (John Katopodis' convictions for mail fraud and wire fraud). Even though he committed those

I.

Jefferson County consists of five districts, each represented by an elected commissioner who serves as the head of a county department. Gary White was elected as a Jefferson County commissioner for four four-year terms beginning in 1990. He held different positions at various times, including president of the commission and head of its General Services Department and of its Road and Transportation Department. So far as the record shows, however, it was not until White became the commissioner in charge of the Environmental Services Department in November 2002 that his corrupt conduct commenced.

His corruption, like that of some of his fellow commissioners, grew out of the county's sewage problem. In 1996 Jefferson County and the United States Environmental Protection Agency entered into a consent decree, settling a Clean Water Act lawsuit over untreated waste being released into the county's rivers and streams. The consent decree required the county to fix its sewer system, which was a mess. The cost of doing so was approximately $3 billion.

The county hired engineering firms to design the necessary repair-and-renovation projects. The Environmental Services Department supervised the

crimes between 2001 and 2008, we have not counted him in the tally of convicted former commissioners because he left office in 1990.

process of hiring those engineering firms. The design contracts were let on a no-bid basis, so typically either a commissioner or staff member selected the firm that would receive the contract. The staff then determined the scope of the work under the contract and negotiated pricing with the contractor. After the staff and the engineering firm agreed on the contract's terms, it would go to the director of the Environmental Services Department for approval and then to the county commissioner in charge of the department. If the commissioner approved the contract, it then went to the environmental services committee, which consisted of that commissioner and two others. They would decide whether to send the contract to the full commission, consisting of the three of them and the two other commissioners, for final approval.

The sewer system reconstruction project was lucrative for U.S. Infrastructure, an engineering firm owned by Sohan Singh. From 1996 to 2005, Singh's company and Jefferson County entered into approximately $50 million worth of contracts involving the sewer system work. Each contract required the county to pay U.S. Infrastructure for its expenses in performing the work plus a professional fee.

In getting contracts with Jefferson County, U.S. Infrastructure had a competitive advantage — bribes that Singh and others paid. Singh and Edward

Key, who was a U.S. Infrastructure vice president, began bribing the county's officials in 1999 in exchange for contracts. See United States v. U.S. Infrastructure, Inc., 576 F.3d 1195, 1202–03 (11th Cir. 2009). One of the officials who was bribed was Chris McNair, a former commissioner in charge of the Environmental Services Department.[3] Id. at 1203–06.

When White took over the duties of supervising the Environmental Services Department in November 2002, Singh did not want to squander the competitive advantage his company had gained by bribing McNair. So, Singh began meeting with White in 2003 and continued doing so through early 2005, which roughly coincided with the period White supervised the Environmental Services Department. At their meetings Singh gave White stacks of $100 bills in envelopes, with the amounts ranging from $1,000 to $4,000 each time. All told, Singh paid White at least $22,000 in cash between 2003 and 2005. Singh got what he paid for. From April 2003 to January 2005, while White was in charge of the Environmental Services Department, the county entered into 48 new contracts with U.S. Infrastructure, paying the firm $1,107,755.55 in professional fees.

---

[3] McNair was not the only "public servant" convicted of corruption charges in connection with the sewer system contracts. Among the others were the Environmental Services Department's former director, its former assistant director, its former chief civil engineer, its former chief construction maintenance supervisor, one of its former engineers, and one of its former maintenance supervisors. See United States v. McNair, 605 F.3d 1152 (11th Cir. 2011).

A federal grand jury issued a superseding indictment that charged White with one count of conspiracy in violation 18 U.S.C. § 371 (Count 1), alleging that he conspired with Singh to commit federal-funds bribery in violation of 18 U.S.C. § 666(a)–(b), and with eight substantive counts of federal-funds bribery (Counts 2–9) for his acceptance of Singh's cash. It also charged White with one count of conspiracy (Count 10) and one count of federal-funds bribery (Count 11) for his acceptance of free architectural plans and hunting trips from an architect whose firm had entered into contracts with Jefferson County. Finally, the indictment included a forfeiture count (Count 12). See 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c).

At trial White moved for a judgment of acquittal on all counts after the close of the government's case-in-chief. The district court denied his motion as to Counts 1–9 and 12 but granted it on Counts 10 and 11—the conspiracy and federal-funds bribery charges arising out of the free architectural plans and hunting trips. White did not present evidence, and the jury found him guilty on counts 1–9.[4]

---

[4]There was a two-and-a-half year delay between the jury's verdict and sentencing, resulting from the district court entering an order setting aside the guilty verdicts on venue grounds, an order that we reversed. United States v. White, 590 F.3d 1210, 1213–15 (11th Cir. 2009).

The presentence investigation report recommended a guidelines range that was calculated based on White's conspiracy conviction. It did so because the base offense level for conspiracy is the base offense level of the substantive offense—here, federal-funds bribery—"plus any adjustments . . . for any intended offense conduct that can be established with reasonable certainty." United States Sentencing Guidelines § 2X1.1(a) (Nov. 2009). The base offense level for federal-funds bribery generally is 12 under § 2C1.1(a)(2), but because White was a "public official" the base offense level was increased to 14. See id. § 2C1.1(a)(1).

The PSR added 2 levels under § 2C1.1(b)(1) because the conspiracy involved more than one bribe and added 4 more levels under § 2C1.1(b)(3) because White was an "elected public official." Finally, the PSR added 16 levels under § 2C1.1(b)(2), determining that U.S. Infrastructure received $1,395,552 in professional fees on its 48 contracts between April 2003 and January 2005 and that those fees were "received in return for" Singh's cash payments to White. All of the adjustments added up to a total offense level of 36, which, combined with White's criminal history category of I, yielded a guidelines range of 188 to 235 months imprisonment. The maximum statutory prison term was 5 years for the conspiracy conviction, see 18 U.S.C. § 371, and 10 years for each federal-funds bribery conviction, see id. § 666(a).

White objected to the 4-level elected-public-official increase and to the 16-level benefit-of-the-bribe increase.  At the sentence hearing, he asserted that the 4-level increase would be impermissible double counting because his base offense level was already being increased by 2 levels because he was a "public official."  The court overruled that objection.  About the 16-level increase, White did not contest the fact that U.S. Infrastructure received more than $1,000,000 in professional fees from the 48 contracts at issue.  He did argue, though, that those fees were not in return for the envelopes full of cash that Singh gave him because most, if not all, of the contracts would have been awarded to the company anyway.

The government responded that the 16-level increase was proper because no Environmental Services Department contract was automatically awarded but instead had to be initially approved by people who were under White's direct supervision.  It further contended that, given White's position as a commissioner and head of the department, he could have "put [his] foot down" and stopped U.S. Infrastructure from receiving a contract.  The district court agreed with the government and overruled White's objection.

The court adopted the PSR as its findings, except that it decreased the amount of U.S. Infrastructure's professional fees from the $1,395,552 recommended in the PSR to $1,107,755.55.  White requested a below-the-

8

guidelines sentence, arguing that he (otherwise?) had good character and stressing the relatively low sentences of others convicted of corruption, his poor medical condition, and "given his age [63] is what it is." The government requested a within-the-guidelines sentence based on the seriousness of White's public corruption, his lack of remorse, the need to deter corruption by public officials, and the widespread problem of corruption in Jefferson County. The district court sentenced White to 60 months imprisonment for the conspiracy conviction and 120 months imprisonment for each federal-funds bribery conviction, with all of the sentences to run concurrently. White's total prison sentence was 120 months, below the recommended guidelines range of 188 to 235 months. The court also imposed a 2-year term of supervised release and ordered $22,000 (the amount of the known cash payments to White) in restitution and forfeiture. White then filed this appeal, challenging the sufficiency of the evidence supporting his convictions and the reasonableness of his prison term.

II.

White contends that the government did not present sufficient evidence to support his convictions for eight counts of federal-funds bribery and one count of conspiracy. We review de novo the sufficiency of the evidence presented at trial, and "we will not disturb a guilty verdict unless, given the evidence in the record, no

trier of fact could have found guilt beyond a reasonable doubt." United States v. Hill, 643 F.3d 807, 856 (11th Cir. 2011) (quotation marks omitted). In reviewing the sufficiency of the evidence, "we look at the record in the light most favorable to the verdict and draw all reasonable inferences and resolve all questions of credibility in its favor." Id. (quotation marks omitted).

A.

White argues that the evidence was insufficient to prove that in accepting Singh's cash payments he acted with corrupt intent. It matters whether he did because the federal-funds bribery statute prohibits an agent of a local government from "corruptly . . . accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such . . . government, . . . involving anything of value of $5,000 or more."[5] 18 U.S.C. § 666(a)(1)(B) (emphasis added). To prove that White committed federal-funds bribery, the government had to prove that he accepted the cash from Singh with the "corrupt intent" to be influenced or rewarded in connection with U.S. Infrastructure's contracts with Jefferson County. See United States v. McNair, 605 F.3d 1152, 1187–88 (11th Cir. 2010).

_____

[5] This statute applies if the local government for which the defendant is an agent accepts more than $10,000 in federal funds in any one-year period. See 18 U.S.C. § 666(b). No one disputes that Jefferson County fits that requirement.

10

The record contains ample evidence of White's corrupt intent to be influenced or rewarded. Singh paid White $22,000 during a period in which U.S. Infrastructure entered into 48 new contracts with Jefferson County. White was the commissioner in charge of the county department that selected U.S. Infrastructure for those contracts and negotiated their terms and pricing. He also had the authority to review and approve each contract before it was presented to the environmental services committee and ultimately to the full commission. White was a member of that committee and the commission, both of which had to approve a contract before it was binding.

At the time of this trial Singh himself had been convicted and sentenced for federal crimes in connection with other acts of corruption involving the Jefferson County sewer system project. See U.S. Infrastructure, 576 F.3d at 1202–03. He was a less than enthusiastic witness for the government against White. He insisted that his cash payments to White had nothing to do with U.S. Infrastructure's contracts with Jefferson County but instead were to compensate White for promoting the company to other municipalities. But Singh conceded that although he had never paid anyone else in cash for doing legitimate work for U.S. Infrastructure, cash was the only way that he ever paid White. Singh also testified that even though he had met White in 1996 or 1997, he did not begin giving him

11

the envelopes full of cash until six or seven years later, which was soon after White became the commissioner in charge of the Environmental Services Department, the department that played a critical role in the contracting process. And Singh also testified that he paid White to keep him happy with U.S. Infrastructure:

Q: Mr. Singh, do you recall testifying before the grand jury in this case?
A: I do.
Q: Do you recall being asked why you gave [White] cash?
A: It was to keep him pretty much happy with [U.S. Infrastructure.]
Q: Was that true when you testified —
A: Yes, sir.

(Emphasis added.)

There is also the undisputed fact that White kept Singh's cash payments secret. During White's term as president of the commission, he had signed an administrative order requiring every county official to submit to the county minute clerk a list of anyone with whom the official had "any form of employment or other relationship which results in any form of compensation or benefit." White did not report Singh's cash payments. And White did not mention to anyone during environmental services committee meetings that he was receiving cash from Singh. The corrupt usually don't advertise their corrupt ways, or as we noted in McNair, "the extent to which the parties . . . conceal their bribes is powerful evidence of

12

their corrupt intent." 605 F.3d at 1197; cf. John 3:20 (RSV) ("For every one who does evil hates the light, and does not come to the light, lest his deeds should be exposed."). There was enough evidence to convict White of the federal-funds bribery charges.[6]

## B.

White contends that the evidence was insufficient to support his conspiracy conviction because it did not prove that he and Singh entered into an agreement to achieve an unlawful objective. To prove conspiracy, the government had to establish: (1) the existence of an agreement between White and Singh that White would commit federal-funds bribery; (2) White's knowing and voluntary

---

[6] White also contends that 18 U.S.C. § 666 required the government to prove that he accepted specific payments from Singh in exchange for providing Singh with specific benefits. In other words, a quid pro quo. We rejected that interpretation of § 666 in McNair. See 605 F.3d at 1188. We have also rejected the argument that the decision in Skilling v. United States, __ U.S. __, 130 S.Ct. 2896 (2010), requires a different result. See United States v. Siegelman, 640 F.3d 1159, 1172 n.17 (11th Cir. 2011) ("Skilling did not deal with federal funds bribery under § 666 at all and, so, does not affect our consideration of these counts of conviction.").

The superseding indictment charged that White committed federal-funds bribery "on or about" eight different dates. White contends that language was not sufficiently specific to provide fair notice of the charges against him. He waived that issue by not raising it before trial. See Fed R. Crim. P. 12(e); United States v. Seher, 562 F.3d 1344, 1359 (11th Cir. 2009) ("Generally, a defendant must object before trial to defects in an indictment, and the failure to do so waives any alleged defects."). Even if he had not waived the issue, the superseding indictment was sufficient. Cf. United States v. Reed, 887 F.2d 1398, 1403 (11th Cir. 1989) (rejecting a variance argument on the ground that "[w]hen the government charges that an offense occurred 'on or about' a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment").

participation in the conspiracy; and (3) an overt act in furtherance of the conspiracy. See 18 U.S.C. § 371; McNair, 605 F.3d at 1195. Because "conspiracies are secretive by nature, the existence of an agreement and [White's] participation in the conspiracy may be proven entirely from circumstantial evidence." U.S. Infrastructure, 576 F.3d at 1203.

The same evidence that supports White's federal-funds bribery convictions supports his conspiracy conviction. As we have already recounted, that evidence established that (1) Singh paid White $22,000 in cash during a period in which U.S. Infrastructure entered into 48 new contracts with Jefferson County; (2) Singh paid White to "keep him pretty much happy with" U.S. Infrastructure; and (3) White kept those payments a secret. That evidence is enough to establish that Singh and White had an agreement for White to commit federal-funds bribery. Requiring direct evidence of the agreement "would allow [White] to escape liability . . . with winks and nods, even [though] the evidence as a whole proves that there" was agreement between White and Singh for White to commit federal-funds bribery. Id. at 1203 (quotation marks omitted).

III.

We turn next to White's contention that his sentence is unreasonable. In reviewing a sentence we apply an abuse of discretion standard. United States v. Irey, 612 F.3d 1160, 1189–90 (11th Cir. 2010) (en banc). We first ensure that the district court committed no significant procedural error, such as improperly calculating the guidelines range. United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). If the sentence is not procedurally unreasonable, we then determine whether it is substantively reasonable. United States v. Gonzalez, 550 F.3d 1319, 1323–24 (11th Cir. 2008).

A.

The guidelines provide for a 16-level increase "[i]f the value of the payment, the benefit received or to be received in return for the payment, . . . whichever is greatest" exceeds $1,000,000. U.S.S.G. § 2C1.1(b)(2) (emphasis added); id. § 2B1.1(b)(1)(I). Because the $1,107,755.55 in professional fees that U.S. Infrastructure received from its White-era contracts with the county were greater than the $22,000 in cash payments that Singh gave White, the district court added 16 levels to White's offense level.

White argues that evidence established that U.S. Infrastructure's

15

$1,107,755.55 in professional fees were not received "in return for" Singh's cash payments, as § 2C1.1(b)(2) requires. At trial Singh testified that U.S. Infrastructure had entered into approximately 150 sewer work contracts with the county before White became head of the Environmental Services Department. And Harry Chandler, the former assistant director of the department, testified that the work that the company had done was always satisfactory. At the sentence hearing Tom Mayhall, an FBI agent who investigated the case, testified that he did not know of any occasion where the commission itself had not approved a U.S. Infrastructure contract, either before or after White became head of the Environmental Services Department. He also said that the department may have had an unofficial practice of entering into new contracts with those firms with which it had previously contracted.

On the basis of that evidence, White argues that the evidence established that the county would have entered into the U.S. Infrastructure contracts regardless of the cash payments he received from Singh.[7] If so, he asserts that the district court erred in finding that the company's professional fees were "in return for" the

---

[7] Of course, one reason that the county entered into those 150 pre-White U.S. Infrastructure contracts may have been that U.S. Infrastructure had bribed Chris McNair when he was the commissioner in charge of the Environmental Services Department from 1998 to 2001. See U.S. Infrastructure, 576 F.3d at 1203–06.

16

bribes. White argues that instead of the 16-level increase based on the more than $1,000,000 in professional fees to U.S. Infrastructure, he should have received only a 4-level increase based on the $22,000 in cash payments to him. See U.S.S.G. §§ 2B1.1(b)(1)(C), 2C1.1(b)(2). If so, his total offense level would have been 24 and his guidelines range would have been 51 to 63 months, well below the 188 to 235 month guidelines range and the 120-month sentence that he actually did receive.

When a defendant challenges the factual basis that the PSR sets forth for his sentence, the burden is on the government to prove the disputed facts by a preponderance of the evidence. United States v. Liss, 265 F.3d 1220, 1230 (11th Cir. 2001). The district court may base its findings of fact at sentencing on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentence hearing. United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004). We review those findings only for clear error. McNair, 605 F.3d at 1230 n.127.

Other circuits have held that § 2C1.1(b)(2)'s "in return for" language requires that the government prove a causal connection between the bribes and the benefit received, see McNair, 605 F.3d at 1230, but they have also held that the causation threshold is a low one, United States v. Kinter, 235 F.3d 192, 198 (4th Cir. 2000) ("The threshold for the causation inquiry for § 2C1.1 calculations is

17

relatively low."), abrogated on other grounds by United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005); see also United States v. Sapoznik, 161 F.3d 1117, 1119 (7th Cir. 1998) (explaining that the bribes need only contribute to or facilitate the business activity involved).

Whatever the level of causation required under § 2C1.1(b)(2), the evidence presented at trial and at sentencing satisfied it. The evidence established that after sewer work contracts were approved by the Environmental Services Department's director, White had the responsibility for reviewing them and deciding whether to approve them for placement on the environmental services committee's agenda. White was himself a member of that committee and of the full commission, both of which had to vote to approve a contract. And Chandler testified that White sometimes directed him to contract with specific firms. Singh testified that he paid White only during a period in which U.S. Infrastructure entered into the 48 contracts at issue and that he did so to "keep him pretty much happy with" U.S. Infrastructure. Further, Mayhall testified at the sentence hearing that a contract could have been stopped at "any point along the way." White was at three points along the way to final approval. Mayhall also testified that White voted to approve 45 of the 48 contracts with U.S. Infrastructure, and that he believed that White was not present for the votes on the other three.

18

All of that evidence was enough to prove by a preponderance that Singh paid White to ensure that he did not prevent the county from approving any contract with U.S. Infrastructure, as he might have done. Under these circumstances, the district court did not clearly err by finding that the company's professional fees were a benefit "received in return for" Singh's cash payments. Application of the 16-level enhancement was not error.

B.

In addition to setting White's base offense level at 14, instead of 12, because he was a public official, see U.S.S.G. § 2C1.1(a), the district court also enhanced it 4 more levels under § 2C1.1(b)(3) because he was an elected public official. White contends that amounts to impermissible double counting. Which it does not. We have held that "[i]mpermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Dudley, 463 F.3d 1221, 1226–27 (11th Cir. 2006) (quotation marks omitted). Because of the critical importance of representative self-government, a guideline that applies to any public official who betrays the public trust does not "fully account[]" for the harm that is inflicted when the trust that the official betrays was conferred on him in an election. Being a bribe-taking

19

"elected public official" is different from being a run-of-the-mill, bribe-taking, non-elected "public official."

C.

Our substantive reasonableness review is guided by the factors in 18 U.S.C. § 3553(a). United States v. Pugh, 515 F.3d 1179, 1188–89 (11th Cir. 2008). The district court is required to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" listed in that statutory provision. 18 U.S.C. § 3553(a). Those purposes include the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment of the offense, deter criminal conduct, protect the public from the defendant's future criminal conduct, and provide the defendant with needed educational or vocational training or medical care. Id. § 3553(a)(2). Among other factors, the district court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the applicable guidelines range, and the need to avoid unwarranted sentencing disparities. See id. § 3553(a)(1), (4), (6).

We ordinarily "expect a sentence within the Guidelines range to be reasonable," United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005), and the burden of establishing that a sentence is unreasonable lies with the party

20

challenging it, <u>Pugh</u>, 515 F.3d at 1189.  We will vacate a sentence for substantive unreasonableness "if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." <u>Irey</u>, 612 F.3d at 1190 (quotation marks omitted).

White's 120-month prison sentence is not unreasonable.  It is below the applicable guidelines range of 188 to 235 months, and there was no abuse of discretion in the court's weighing of the § 3553(a) factors.  As the district court explained in imposing the sentence:

> [M]y obligation in this case is to sentence you to a sentence which is sufficient but not more than necessary to accomplish the sentencing goals set forth in the federal statutes.  And those goals are not just whether or not you personally will ever be able to accomplish this type of crime again; that's not the sole thing that I have to consider in determining the sentence.  I also have to consider and find appropriate, in addition to the nature and circumstances of the offense and history and characteristics of you, Mr. White, which is demonstrated by the number of people that are here and all these letters that are written by folks that you have done a lot of admirable things in your life, that you have served your community.  But also to reflect the seriousness of the offense and promote respect for the law, provide just punishment for you, and to afford adequate deterrence to criminal conduct.
>
> You see, when someone's elected to a position of trust as an elected official, they don't have the right . . . they don't have a right to have a bag . . . at all.  It's not a function of how big the bag is, they just don't have a right to have a bag that they can carry around stuff they get from people that are

21

involved with them in this process. And, so, I think a sentence which is 120 months total is appropriate.

Indeed.

**AFFIRMED.**