[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-13376
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2012
JOHN LEY
CLERK

D.C. Docket No. 0:09-cr-60316-JIC-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FITZROY DANIEL SALESMAN,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 24, 2012)

Before HULL and FAY, Circuit Judges, and BOWEN,* District Judge.

PER CURIAM:

Defendant Fitzroy Salesman, a former city commissioner in Florida, appeals his convictions and 51-month total sentence for two counts of accepting bribes in programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B), and two counts of attempted extortion under color of official right, in violation of 18 U.S.C. § 1951. After review and oral argument, we affirm.

## I. BACKGROUND

Defendant Salesman was elected as a Miramar, Florida, city commissioner in 2001, and four years later, he was reelected. A few months after his reelection, Salesman was suspended from his official duties for matters unrelated to this case. Specifically, Salesman was suspended from June 30, 2005, until March 27, 2007, and then again beginning December 11, 2007.

Around March 2005, the Federal Bureau of Investigation ("FBI") began a public corruption investigation in south Florida, including the City of Miramar. Salesman became a subject of that investigation in late March 2005. Salesman was ultimately charged with bribery and extortion in connection with two cash

---

*The Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

2

payments of $340 and $3,000 he received in July 2007.

## A.     The FBI's Initial Contacts with Salesman

The FBI's first contact with Salesman occurred at a strip club on March 25, 2005, when a cooperating witness introduced undercover FBI Agent Anthony Velazquez (a.k.a. "Tony Lopez") to Salesman. Salesman informed Agent Velazquez that he was a Miramar city commissioner and showed him his ID badge. For his part, Agent Velazquez told Salesman of his involvement in money laundering and need for opportunities to "clean" $1-to-$2 million. Salesman indicated his ability to assist Agent Velazquez in doing so by identifying potential real estate opportunities in Miramar.

Over the next several months, Agent Velazquez and Salesman met to discuss the Miramar investment opportunities and to meet other "associates" of Agent Velazquez. Although Salesman was suspended on June 30, 2005, the FBI continued to contact Salesman. Agent Velazquez arranged a meeting for August 24, 2005, where Salesman was to meet some of Velazquez's other associates. Salesman told Agent Velazquez before the meeting that he did not "even want to know where [his associates] get their money from." Striking a theme that he would continue for the next few years, Salesman stated he had a consulting business and his fee rate was between 1-2% for any real estate opportunities he presented, but

3

only if the deal was completed.

At the August 2005 meeting, Agent Velazquez introduced Salesman to the undercover agents who would primarily run the investigation of Salesman for the next several years: Agent Dave Billitier (a.k.a. "Dave Bianchi") and Agent Michael McGowan (a.k.a. "Mike Moretti" or the "Old Man"). Agents Billitier and McGowan represented themselves as businessmen involved in construction through their company Target Construction ("Target").[1] They wanted real estate construction work in south Florida. Salesman offered assistance, indicating that he could provide introductions to local government officials, who would help Target obtain the desired construction jobs. After being told that Agent Velazquez and Agent McGowan had perpetrated insurance fraud together, Salesman was unfazed, suggesting at one point that he receive money in exchange for helping Agent McGowan obtain a construction deal.

### B.    Salesman's Efforts for Target During His Suspension

Salesman continued his involvement with the undercover agents throughout the period of his first suspension. In September 2005, Salesman met with Agents Velazquez and Billitier to discuss real estate opportunities. The men discussed

---

[1]Target Construction was an actual company run by Stephen Scacco. Scacco agreed to assist the FBI in this investigation.

Agent McGowan's method of business, which was "greasing palms" to obtain the desired work. Salesman expressed unease with this "old school" method, noting the possibility of jail. Instead, Salesman offered a purportedly safer way of obtaining work by brokering introductions and opportunities, through his position as a "consultant." Salesman, however, demurred from being present when the actual deals were made.

Salesman met two other "associates" of Agent McGowan's in January 2006, undercover FBI Agent Patrick Wren (a.k.a. "Pat Foster") and Patrick Lochrie, a cooperating witness. They discussed real estate opportunities in Broward County, and Salesman offered to introduce Agent Wren and Lochrie to local politicians. The three men met again in February 2006, where Agent Wren and Lochrie advised Salesman that Agent McGowan was willing to pay to obtain construction work. At a meeting a week later, Agent Wren offered an envelope containing $1,500 cash to Salesman for providing introductions to local politicians. Salesman accepted the envelope.

On February 27, 2006, Salesman introduced Vice Mayor Josephus Eggelletion to Agent Wren and Lochrie, describing them as representatives of a construction company interested in work in Broward County. Agent Wren explained that they would provide any appropriate financial compensation to assist

5

the award of the construction contracts. Vice Mayor Eggelletion observed he knew of a suitable project that had been recently awarded, but could be "blow[n] . . . up": an affordable housing project in Lauderhill, Florida. After the meeting, Salesman told Agent Wren and Lochrie that if he did not deliver on the job, they did not owe him anything.

Salesman and Agent Wren met with Dale Holness, a Lauderhill city commissioner, to discuss the affordable housing project on April 11, 2006. Salesman explained that "the old man was willing to do anything he needed to to get contracts." Holness then called a city employee on his cellular telephone. Later that same day, Agent Wren gave Salesman an envelope containing $1,000 cash, which Salesman accepted. Subsequently, at Agent Billitier's request, Target submitted bids for major projects in Lauderhill, but was not awarded them.

Also in April 2006, Salesman discussed with Agent Wren and Lochrie the possibility of obtaining no-bid contracts[2] for Target. Salesman mentioned a potential gazebo project in Miramar, and then called Miramar City Manager Robert Payton to arrange a meeting to discuss the no-bid contracts. Salesman told Payton he was providing consulting work for Target. At the meeting with Payton,

---

[2]"No-bid" construction contracts were those under $50,000 in value. Construction contracts worth more than $50,000 were required to go through a public bidding process.

Salesman inquired whether Payton had any no-bid contracts to give Target. Payton eventually agreed to give Target the gazebo construction project.

To follow up on his agreement, Payton called Lowell Borges, the chief operations officer for Miramar. Borges had the ultimate power to award the no-bid construction jobs. Payton suggested the gazebo project be given to Target. Salesman also called Borges to recommend Target for the job.

Borges, however, delayed award of the project due to budget issues. While the project was on hold, Salesman repeatedly called Borges for status updates and inquiries about whether Target was kept busy. Salesman also met another undercover FBI Agent, John Osa. Agent Osa and Salesman arranged a boat day-trip with some elected officials, Salesman, and Agents Wren and McGowan for February 24, 2007.

Months after the gazebo project was first discussed, funds finally became available. On March 16, 2007, Target submitted a quotation for the gazebo of $34,366 and was awarded the project. Salesman was reinstated as commissioner effective March 27, 2007, before the project was completed.

## C. Salesman's Efforts for Target While an Active Commissioner

Target completed the gazebo project in about five weeks. Eric Berry, the Assistant Director of the Miramar Parks Department, signed off on the project on

7

April 20, 2007, and a week later, mailed a check for $34,366 to Target.

On April 30, 2007, Agent Osa called Salesman letting him know that he was now overseeing Agent McGowan's construction contracts. Salesman responded that he would see if any construction projects were available for Target. Agent Osa commented that he would allow Salesman time to settle back in office.

Following Target's receipt of payment for the gazebo, Agent Osa and Salesman met on May 10, 2007, to discuss how Salesman was to be paid. Salesman expressed concern about the possibility of jail if taxpayers' money was misused. Salesman noted that he had refused a suggestion by Agent Wren to sign a contract because he only took money when he delivered on a deal, and only then would he name his fee. Eventually, Agent Osa and Salesman reached a fee agreement, whereby Salesman would receive 1% of the contract price. Salesman noted his belief that as long as the contractor performed the work it was hired to do, then no kickback was involved.

Additionally, Salesman reiterated to Agent Osa that he was acting as a consultant and gave Agent Osa his business card for "FDS Funding and Consulting." The company was registered in Tallahassee as a sole proprietorship. At trial, however, the government introduced Salesman's personal income tax returns for the years 2005–2007, which showed Salesman had not reported any

income from FDS Funding and Consulting, despite receiving several thousand dollars from undercover FBI agents in 2006 and 2007. As a sole proprietor of a business, Salesman was required to report any income from the business on his personal income tax return.

Salesman continued to contact Miramar officials about further construction opportunities for Target, including another gazebo project. At one meeting with Agent Osa in May 2007, Salesman told him that there was a future gazebo project available. Agent Osa stated that Agent McGowan would be in town at the end of the month to "settle up."

On July 11, 2007, Salesman met with Agent Osa and Agent Billetier to discuss upcoming projects and to receive payment for the gazebo project. Salesman promised to confirm a potential renovation project—the construction of a sprung wood floor for a recreation center—and the second gazebo project. Agent Osa handed Salesman an envelope containing $340 cash, representing Salesman's approximately 1% fee, as determined by the $34,366 contract price of the first gazebo project. Agent Osa told Salesman his "bonus" depended on him obtaining confirmation about future projects.

Agent Osa contacted Salesman on July 28, 2007, letting him know that Agent McGowan was in town and "had a present for him." That afternoon,

9

Salesman met Agents Osa, Wren, and McGowan at a hotel. After chatting about upcoming construction projects, Salesman met with Agent McGowan alone in his room. They discussed Target's past work in Miramar, as well as future projects, including the potential renovation project. Agent McGowan noted Salesman's reinstatement as a commissioner was good for his business. Salesman agreed that his return to office augured growth for Target, emphasizing his positive relationship with the other city officials, and taking credit for Target's ability to receive the projects. After continued inquiry about Salesman's efforts for Target, Agent McGowan asked Salesman why he deserved a bonus. Salesman emphasized his role in having Target obtain small projects and build city officials' trust, which would then lead to the award of larger projects.

The conversation topic turned to Salesman's compensation. Salesman reiterated that he did not ask for money until he delivered on his promises. Agent McGowan asked whether Salesman had a problem with a good faith payment, and Salesman assured him he did not. Agent McGowan then counted out $3,000 and placed the cash into an envelope on the hotel room's table, characterizing it as a "bonus." After pocketing the envelope, Salesman left the room.

In the hotel lobby, Salesman confirmed to Agent Osa that he had received $3,000 from Agent McGowan. They discussed the potential renovation project

again. Salesman directed Agent Osa to keep up with the project, as Agent McGowan knew about it.

In August 2007, following encouragement from city officials Berry and Borges, Target submitted a quotation for the renovation project and was awarded the job. Target completed the construction on September 19, 2007, and on October 13, 2007, received a check for $28,475.

Agents Wren and Osa met with Salesman on September 18, 2007, to discuss future projects for Target. Salesman noted that budget cuts had impeded the availability of new construction projects. Salesman further advised that he needed to be cautious in his activities because he was no longer suspended; under Florida's Sunshine Law, if he accepted any compensation from them, it would be considered a kickback. Nevertheless, Salesman agreed to continue their relationship, and in fact called Borges during the meeting to tell him to keep Target busy.

## D.    Conclusion of the Investigation

Salesman had two final meetings with FBI agents, on December 4, 2007, and February 12, 2008, to discuss potential construction work. Salesman stated that the contracts had been cut back due to the bad economy and that he would not accept any more money until he delivered. No other projects materialized.

On November 12, 2009, Salesman was indicted. The superseding

11

indictment charged Salesman, as a Miramar city commissioner, with accepting

bribes (the $340 and $3,000 payments) in programs receiving federal funds, in

violation of 18 U.S.C. § 666(a)(1)(B) (Counts 1 and 2); extortion and attempted

extortion under color of official right, in violation of 18 U.S.C. § 1951 (Counts 3

and 4); deprivation-of-honest-services mail fraud, in violation of 18 U.S.C.

§§ 1341 and 1346 (Count 5); and deprivation-of-honest-services wire fraud, in

violation of 18 U.S.C. §§ 1343 and 1346 (Count 6).

Salesman pled not guilty and proceeded to a jury trial. The jury found

Salesman guilty of Counts 1 through 4, and acquitted him on Counts 5 and 6.

## E.     The PSI and Pre-Sentence Objections

The Presentence Investigation Report ("PSI") determined Salesman's base

offense level was 14, pursuant to U.S.S.G. § 2C1.1(a)(1). The PSI then increased

the level by 16, as follows: 2 levels because the offense involved more than one

bribe, pursuant to U.S.S.G. § 2C1.1(b)(1); 10 levels because the benefit received in

return for the bribe was between $120,000 and $200,000, pursuant to U.S.S.G.

§ 2C1.1(b)(2); and 4 levels because Salesman was an elected public official,

pursuant to U.S.S.G. § 2C1.1(b)(3). Salesman's total adjusted offense level was

30. With 1 criminal history point, his criminal history category was I. The

resulting advisory guidelines range was 97 to 121 months' imprisonment as to each

count.  The statutory maximum term was 10 years for Counts 1 and 2, and 20 years for Counts 3 and 4.

Prior to the sentencing hearing, Salesman filed several objections, of which only one is relevant on appeal.  Salesman argued the PSI incorrectly calculated the benefit received as a result of his offenses because it was based on (1) Target's 30% profit on completed projects, when there was no evidence at trial that Target actually received that percentage, and (2) two projects that, based on the evidence at trial, had never been awarded to Target.

## F.    Sentencing Hearing

At sentencing, the district court partially granted Salesman's objection regarding the calculation of the amount of the benefit received.  Specifically, the district court found that the government had established only a benefit amount of more than $10,000 but less than $30,000, for the two completed projects of the first gazebo job and the renovation flooring project.  The court based the benefit amount on testimony from Target's Stephen Scacco, who testified he realized a 30% profit on both of the finished projects, or a total of $22,000, and on work quotes that the government introduced into evidence.  Salesman's total adjusted offense level became 24, reflecting a 4-level enhancement under U.S.S.G. § 2C1.1(b)(2), and the advisory range of imprisonment became 51 to 63 months.

13

Salesman argued for a sentence at the low end of the advisory guidelines range, or for a downward variance. The district court questioned Salesman's counsel regarding another defendant's sentence, as that defendant had been convicted of similar bribery offenses. Salesman's counsel admitted that he was unfamiliar with the precise facts of that case. Nonetheless, he argued that the other defendant had taken more money than Salesman had and that the facts of Salesman's case weighed in favor of a lesser sentence than the 37 months' imprisonment the other defendant had received. The district court observed that the other defendant had benefitted from a 3-level reduction for accepting responsibility and pleading guilty, and that but for the reduction, she and Salesman had the same adjusted offense level of 24.

After Salesman spoke in allocution, the district court stated that it had considered the parties' arguments, the PSI, and the 18 U.S.C. § 3553(a) sentencing factors. The court opined that Salesman was "every . . . bit as guilty" as the other defendant and that the court recognized the need to avoid sentencing disparities between defendants with similar records. The district court imposed a 51-month sentence as to each count, to be served concurrently. The sentence, the court observed, was justified by the other defendant's "sentence imposed by this Court, Mr. Salesman's similar conduct, a category one criminal history, and Mr.

Salesman's failure to accept responsibility." Further, the sentence "affords just punishment, adequate deterrence, and meets the standard of reasonableness." Salesman reasserted his previous objections at the close of the sentencing hearing, which the court overruled.

The district court sentenced Salesman to concurrent terms of 51 months' imprisonment and 36 months' supervised release. Salesman then appealed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Salesman challenges the sufficiency of the evidence to support his convictions on all counts. This Court reviews de novo the sufficiency of the evidence. United States v. McNair, 605 F.3d 1152, 1195 n.54 (11th Cir. 2010). In our review, this Court "look[s] at the record in the light most favorable to the verdict and draw[s] all reasonable inferences and resolve[s] all questions of credibility in its favor." United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011) (internal quotation mark omitted). To support a conviction, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. A jury is free to choose among reasonable constructions of the evidence." United States v. Ospina, 823 F.2d 429, 433 (11th Cir. 1987).

1. Convictions for Bribery

Salesman contends the evidence was insufficient to support his two convictions for bribery under 18 U.S.C. § 666(a)(1)(B). This statute makes it a crime for a state official to corruptly accept anything of value from another person "intending to be influenced or rewarded" for official actions in that person's favor. Salesman argues he was not an agent of Miramar when he helped Target obtain the first gazebo project, and he did not act corruptly in receiving the two cash payments because he was not involved in the gazebo contract after reinstatement as commissioner. See 18 U.S.C. § 666(d)(1) (defining "agent" as one who is "authorized to act on behalf of another person or a government").

To the extent Salesman's arguments rest on his assertion that there must be a "quid pro quo," they are without merit. In United States v. McNair, we squarely rejected the proposition that a bribery conviction under § 666(a)(1)(B) requires such proof. 605 F.3d at 1188; see also White, 663 F.3d at 1214 (reaffirming McNair's conclusion in the wake of Skilling v. United States, 130 S. Ct. 2896 (2010)).[3]

_____

[3]Salesman points to language in United States v. Siegelman, 640 F.3d 1159 (11th Cir. 2011), that arguably suggests there must be a quid pro quo. However, the jury instructions in Siegelman contained a quid pro quo instruction, and this Court expressly stated it was not deciding whether § 666 required a quid pro quo instruction. Regardless, we are obligated to follow McNair under the prior panel precedent rule. See United States v. Fulford, 662 F.3d 1174, 1178-79 (11th Cir. 2011).

16

While it is unclear whether Salesman makes a sufficiency claim beyond his misplaced quid pro quo argument, regardless, we conclude that there is sufficient evidence to support the jury's findings. As to Salesman's suggestion that he could not be convicted for actions taken while suspended, that much is true. Indeed, the jury was instructed on this point, and the government acknowledged at trial that it made "no contention that the defendant may be convicted of bribery based on actions taken prior to March 26, 2007." But Salesman took numerous actions while not suspended that support his convictions. These continual efforts included contacting city personnel such as Borges about Target, meeting with the undercover FBI agents to discuss future city projects for Target, and telling Agent McGowan when he accepted the July 28 payment that he would continue to deliver future contracts for Target. Under § 666(a)(1)(B), "the government is not required to tie or directly link a benefit or payment to a specific official act" by Salesman. McNair, 605 F.3d at 1188. The jury could have reasonably inferred that Salesman accepted the two cash payments not as a reward for his prior efforts in securing the first gazebo project, but as a reward for his efforts on behalf of Target to find more Miramar projects. See Ospina, 823 F.2d at 433.

The evidence was also sufficient to support the jury's conclusion that Salesman "corruptly" accepted the two payments. The district court instructed the

17

jury that "corruptly" meant acting "voluntarily, deliberately and dishonestly for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by any unlawful method or means." Salesman argues that he was paid for his work as a "consultant" for Target only during the period of his suspension. However, Salesman presented that argument to the jury, and the jury rejected that theory.

The jury's finding as to that element is supported by the evidence showing Salesman was aware that his behavior after he was reinstated was potentially illicit. In a September 2007 meeting with the agents, for example, Salesman told them that he had to be "very careful" in helping Target obtain Miramar construction contracts because of state law prohibiting "kickback[s]." The jury also heard evidence refuting Salesman's claim that he acted as a consultant, such as refusing to sign a contract and failing to declare any of the payments he accepted from the agents on his income tax returns for 2005–2007. From all of this, a reasonable jury could conclude that Salesman was guilty of both bribery counts.

2.      Convictions for Attempted Extortion Under Color of Official Right

Salesman's second contention is that the evidence was insufficient to support his convictions for attempted extortion under color of official right, in

18

violation of 18 U.S.C. § 1951 (the Hobbs Act).[4]  The statute defines "extortion" as

"the obtaining of property from another, with his consent, induced by wrongful use

of actual or threatened force, violence, or fear, or under color of official right."  Id.

at § 1951(b)(2).  In Evans v. United States, the Supreme Court held that the quid

pro quo requirement of the offense does not require fulfillment of the quid pro quo,

but only that "the public official receive[] a payment in return for his agreement to

perform specific official acts."  504 U.S. 255, 268, 112 S. Ct. 1881, 1889 (1992).

In other words, "the Government need only show that a public official has obtained

a payment to which he was not entitled, knowing that the payment was made in

return for official acts."  Id.  Salesman argues only that his acceptance of the two

payments was not "wrongful" because they were for his "consulting" services

performed while suspended as a commissioner, and thus there was no quid pro quo

for an official act.

　　We reject Salesman's argument and conclude sufficient evidence exists to

---

[4]This section states:
Interference with commerce by threats or violence
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
18 U.S.C. § 1951(a).

support his attempted extortion conviction. A reasonable construction of the evidence shows that Salesman accepted the payments and contemporaneously agreed, in response to inquiry by the undercover agents, to try to help Target obtain more city construction projects. Before accepting the $340 payment, Salesman told Agents Osa and Billitier that he would contact city officials to obtain information about the renovation project and then provide confirmation to them. A couple weeks later, Salesman, before accepting the $3,000 payment, told Agent McGowan that he had more projects to deliver, including the renovation project. Salesman contends the payments were a "1% fee" and "bonus" for the original gazebo project, but "[a] jury is free to choose among reasonable constructions of the evidence." Ospina, 823 F.2d at 433. We cannot say the jury's construction and verdict were unreasonable.

3. Entrapment

Salesman argues the evidence was insufficient to establish that he was predisposed to commit the bribery and extortion offenses. An entrapment defense has two elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition. United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995). The defendant bears the initial burden of showing government inducement. Id. The burden then shifts to the government to prove beyond a reasonable doubt the

20

defendant's predisposition to commit the crime. Id. Salesman contends the government failed to meet its burden because it offered no proof of similar conduct before the FBI investigation began.

This argument is meritless. Our inquiry on the second element focuses not on "the defendant's ability to engage in criminal acts," but rather on whether the defendant "prompt[ly] commi[tted] . . . the crime at the first opportunity," which "is enough to show predisposition." Id. at 624. "The government need not produce evidence of predisposition prior to its investigation." Id. at 625. Here, the evidence demonstrated that Salesman was ready and willing to commit the charged crimes. At the initial meeting with Agent Velazquez, Salesman was informed that his new companion had engaged in insurance fraud and money laundering. Nonetheless, Salesman was not dissuaded from continuing his relationship with Agent Velazquez and his associates. Salesman himself recognized that his activities on their behalf were fraud with potential criminal repercussions, observing at one point in May 2007 that there was a possibility of jail if problems arose with Target's construction projects. Further, before offering the $3,000 cash to Salesman, Agent McGowan gave Salesman the opportunity to leave if McGowan's methods bothered him. Salesman nonetheless stayed and pocketed the money. We also note that throughout the agents' interactions with Salesman, they

21

did not beguile him into committing the crimes by assuring him that his actions would be lawful. Cf. Jacobson v. United States, 503 U.S. 540, 553, 112 S. Ct. 1535, 1543 (1992) ("The evidence that petitioner was ready and willing to commit the offense came only after the Government had devoted 2 1/2 years to convincing him that he had or should have the right to engage in the very behavior proscribed by law."). Thus, after reviewing the evidence, we conclude the government presented sufficient evidence for a reasonable jury to find that Salesman was predisposed to commit the bribery and extortion offenses.

## B.  Right to a Fair Trial

Salesman claims numerous errors in his trial, which together allegedly deprived him of a fair trial.[5] We review de novo a claim of cumulative error. United States v. Hoffman-Vaile, 568 F.3d 1335, 1340 (11th Cir. 2009). But where there is no error or only a single error, there cannot be cumulative error. United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004).

### 1.  Jury Instructions

Salesman raises four objections to the jury instructions, none of which were

---

[5]We address only the errors on which Salesman presents argument. Salesman asserts in passing several errors, but fails to present argument about them in his opening brief. Salesman's failure to present argument about these errors precludes this Court's review. United States v. Gupta, 463 F.3d 1182, 1195 (11th Cir. 2006); see also United States v. Magluta, 418 F.3d 1166, 1185 (11th Cir. 2005) ("[A]n appellant may not raise an issue for the first time in a reply brief.").

22

raised below. Jury instructions that are challenged for the first time on appeal are

reviewed for plain error.[6] United States v. Felts, 579 F.3d 1341, 1343-44 (11th Cir.

2009). Under the plain error standard, the defendant must show that an error

occurred, it was plain, and it affected substantial rights. United States v.

Barrington, 648 F.3d 1178, 1190 (11th Cir. 2011). If that showing is met, we have

discretion to correct the forfeited error if it seriously affected "the fairness,

integrity, or public reputation" of the district court proceedings. Id.

There was no error, much less plain error, in the district court's jury

instructions. Salesman first asserts the district court erred by not defining

"attempt" in its instructions. But the district court was under no obligation to do

so. See United States v. Gonzalez, 940 F.2d 1413, 1427 (11th Cir. 1991)

("[T]erms [that] are within the common understanding of the jury need not be

defined in the jury instructions. 'Attempt' is not an overly technical or ambiguous

---

[6]Salesman argues that review should be de novo because the district court failed to present the opportunity to timely object to the jury instructions. As our above review of the record shows, however, the district court presented Salesman with multiple opportunities to object. And indeed, he did object—just not to the now-challenged instructions. We therefore reject his request for de novo review.

We also reject the government's argument that Salesman invited any alleged error as to the jury instructions. In response to the district court inquiry whether there were any objections to the court's draft jury charges, Salesman stated, "Just other than what was contained in our pleadings that we filed in response to the government's brief," and other language to that effect. He did not affirmatively state that the instructions were "acceptable," nor did Salesman introduce the proposed instructions. These facts distinguish Salesman's case from the invited error case cited by the government, United States v. Silvestri, 409 F.3d 1311, 1325-27 (11th Cir. 2005).

23

term, nor is it beyond the common understanding of the jury."). Accordingly, the district court did not err in not defining "attempt."

Next, Salesman argues the district court erred by not instructing the jury on the law applicable to receipt of payment by a state agent for work performed prior to becoming a state agent. We are unpersuaded by this argument, for the district court clearly instructed the jury that acts taken by Salesman while he was suspended were not "official acts."

Salesman asserts it was error to charge the jury on the "reward" rather than "influence" element of the statute. The statute, however, is framed in the disjunctive, and the indictment tracked that language. The district court's instructions omitted the "influence" element and charged only on the "reward" element, which actually narrowed the possible grounds for conviction. See United States v. Castro, 89 F.3d 1443, 1452-53 (11th Cir. 1996) ("A constructive amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment."). We thus reject this argument, too. See United States v. Simpson, 228 F.3d 1294, 1300 (11th Cir. 2000) ("[T]he law is well established that where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the

means, and accordingly the jury instruction may properly be framed in the disjunctive.").

Salesman finally argues that the district court erred by not instructing the jury that a quid pro quo was necessary for conviction on the bribery counts. As we explained above, our precedent precludes this argument. See McNair, 605 F.3d at 1188.

Accordingly, there was no error in the jury instructions.

2.     Government Comments

Salesman argues that the government's closing argument impermissibly vouched for the strength of the government's case and disparaged defense counsel and the defendant. Salesman points to several statements: (1) "Since the evidence is so strong, since the defendant has been caught red-handed on tape recordings eagerly taking his bribe money, there's only one way he could be found not guilty, if there was some confusion, if you had some difficulty applying the facts and the law that [the district court] gave you and how that connects with the indictment."; (2) "[W]e just heard from defense counsel. And he gave his version of events. He was able to speak out of, as attorneys sometimes do, both sides of his mouth."; and (3) "And while the defendant through his counsel is speaking out of both sides of his mouth, so has the defendant as you have heard through the course of this trial."

25

Because Salesman failed to object below to these statements, we review for plain error. United States v. Eyster, 948 F.2d 1196, 1206 n.14 (11th Cir. 1991). The plain error rule is invoked in this circumstance only when a review of the entire record persuades this Court that "a miscarriage of justice would otherwise result." United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 1046 (1985).

The prosecutor's statements were not improper. The first two statements were permissible comments on the quantum of evidence against Salesman and the failure of the defense to address or counter the evidence. United States v. Chirinos, 112 F.3d 1089, 1100 (11th Cir. 1997) ("[I]t is not improper to comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence . . . ."). Salesman contends the third statement could be interpreted as a reference to the jury's having heard no testimony from him at trial. In context, however, the statement clearly refers to the extensive recordings played during trial of Salesman's interactions with the undercover FBI agents.

We also note that, even assuming any possible impropriety, the plain error standard is not met for two reasons: The district court issued a curative instruction, and the government's evidence was strong. See United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985). As to the first, the district court instructed the jury that arguments of counsel were not evidence and that the government had the

26

burden of proving guilt beyond a reasonable doubt. And second, as the evidence recounted above demonstrates, the government had a convincing case against Salesman. For these reasons, we conclude there was no error in the prosecutor's comments.

## C.    Motion for New Trial

Salesman argues the district court erred in denying his motion for new trial based upon "new evidence." This "new evidence" is a juror's post-trial comment to a newspaper that "a lot of the jurors agreed with the defense that there had been some entrapment of Salesman by FBI agents who befriended him," but the jurors "had to follow the wording of the law." This Court reviews for abuse of discretion a district court's denial of a motion for new trial. United States v. Vallejo, 297 F.3d 1154, 1163 (11th Cir. 2002).

Here, the district court did not abuse its discretion in denying Salesman's motion for new trial. In its reasoning, the court observed that there was no evidence of outside influence or extrinsic evidence having affected the jury's verdict; the juror's comment in the newspaper article included the caveat that the jury was bound to follow "the wording of the law"; the court's entrapment instruction had stated that entrapment could be found if a defendant was ready to commit the charged offenses and the government "did no more than offer an

opportunity"; and the jury had performed its assigned task by following the court's instructions. We agree with the district court's well-reasoned order and thus affirm the denial of the motion.

**D.     Sentencing**

Salesman argues that his 51-month total sentence is procedurally and substantively unreasonable. As to procedural error, Salesman argues the district court improperly calculated his advisory guidelines range because the court based its finding of the "benefit received or to be received" on speculation and erroneous findings of fact. As to substantive error, Salesman argues his sentence is disproportionate to the sentences received by the other targets of the FBI investigation because they received shorter sentences for "more culpable behavior."

This Court reviews the reasonableness of a sentence under a "deferential abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). The party challenging the sentence carries the burden of establishing unreasonableness. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). This Court utilizes a "two-step process" in reviewing the reasonableness of a sentence. United States v. Turner, 626 F.3d 566, 573 (11th Cir. 2010). First, this Court determines whether the sentence is procedurally

sound, and second, whether the sentence is substantively reasonable. United States v. Gonzalez, 550 F.3d 1319, 1323-24 (11th Cir. 2008). The application of the guidelines is reviewed "for clear error as to factual findings and de novo as to questions of law." United States v. Knight, 562 F.3d 1314, 1322 (11th Cir. 2009).

1.      Procedural Reasonableness

A sentence may be procedurally unreasonable if the district court, among other things, improperly calculates the guidelines range. Gonzalez, 550 F.3d at 1323. At sentencing, the government must prove by a preponderance of the evidence any fact to be considered by the district court, including the applicability of any guidelines enhancements. United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004). This burden must be satisfied with "reliable and specific evidence." United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997) (internal quotation marks omitted). The findings of fact made by the sentencing court may be based on "evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." Polar, 369 F.3d at 1255.

Section 2C1.1(b)(2) of the guidelines, read in conjunction with the table in § 2B1.1(b)(1), provides for a 4-level enhancement "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of

anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest," exceeded $10,000. U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(C); United States v. Huff, 609 F.3d 1240, 1245 (11th Cir. 2010). In this case, the value of the bribes paid ($3,340) would be used in the calculation only if it exceeded the value of the benefit or if the value of the benefit could not be determined with reasonable certainty. Huff, 609 F.3d at 1245-46. The value of the improper benefit need only be estimated. United States v. DeVegter, 439 F.3d 1299, 1303-04 (11th Cir. 2006).

Here, the district court did not commit clear error in determining that the "value of . . . the benefit received or to be received in return for the payment" was more than $10,000 and less than $30,000. The district court based its findings on testimony presented at the sentencing hearing that Target earned approximately $22,000 in profit as a result of the bribes paid to Salesman. Because the government presented "reliable and specific evidence" in support of this benefit amount, the district court properly disregarded Salesman's suggestion that the amount of the bribes should be used to set the benefit amount for sentencing purposes. Sepulveda, 115 F.3d at 890; see Huff, 609 F.3d 1245-46. Based on this $22,000 benefit amount, the district court did not err in applying a 4-level enhancement to Salesman's sentence under § 2C1.1(b)(2). Accordingly,

30

Salesman's 51-month total sentence is procedurally sound.

2.    Substantive Reasonableness

We review Salesman's sentence for substantive reasonableness in light of the record and the § 3553(a) factors.  Talley, 431 F.3d at 786, 788.  The sentence imposed must be "sufficient, but not greater than necessary" to achieve the purposes of sentencing outlined in § 3553(a)(2).  18 U.S.C. § 3553(a).  The weight given to any § 3553(a) factor is within the sound discretion of the district court, and this Court will not substitute its judgment in weighing the relevant factors.  United States v. Amedeo, 487 F.3d 823, 832 (11th Cir. 2007).  Although this Court does not automatically presume reasonableness for a sentence within the guidelines range, it ordinarily expects such a sentence to be reasonable.  United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

Salesman has not demonstrated that his sentence was substantively unreasonable in light of the record and the § 3553(a) factors.  The district court's sentence of 51 months for each count represented the lowest end of the applicable advisory guideline range, and this Court ordinarily expects sentences within the guideline range to be reasonable.  Hunt, 526 F.3d at 746.  Salesman's sentence was also well below the statutory maximum penalty for each count, a further indicator of reasonableness.  See Gonzalez, 550 F.3d at 1324.  And as to Salesman's

argument about the disparity between his sentence and that of other defendants in the investigation, it is without merit for the reasons discussed by the district court. See also United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009) (holding that a cooperating defendant who signs a plea agreement and one who provides no assistance to the government and proceeds to trial are not similarly situated for sentencing purposes); United States v. Regueiro, 240 F.3d 1321, 1325-26 (11th Cir. 2001) ("[A] [d]isparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal.").

Prior to announcing its sentencing decision, the district court stated that it had taken into consideration the § 3553(a) factors, and was particularly mindful "of the statutory mandate which expresses a need to avoid unwarranted sentence disparities among defendants with similar records who are found guilty of similar conduct." The district court sentenced Salesman "in light of the [other defendant's] sentence imposed by this Court, Mr. Salesman's similar conduct, a category one criminal history, and Mr. Salesman's failure to accept responsibility." The district court did not abuse its discretion by emphasizing only some of the sentencing factors because the weight to be accorded any given § 3553(a) factor is within the discretion of the district court. Amedeo, 487 F.3d at 832. Salesman's 51-month total sentence is substantively reasonable.

For all of these reasons, we affirm Salesman's convictions and sentences.

**AFFIRMED.**