[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12538

_____

D.C. Docket No. 0:11-cr-60121-WPD-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES MOZIE,
a.k.a. Red,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

( May 22, 2014)

Before CARNES, Chief Judge, WILSON and FAY, Circuit Judges.

CARNES, Chief Judge:

James Mozie hosted "parties" at his house six days a week, every day but Sunday.  With the help of his family members, including his teenage sons, he sold food, alcohol, and drugs to his party guests.  He also sold sex, providing young girls who would strip for tips and have sex for money.  Many of them were teenagers and one was only thirteen.  For them Mozie's home was a den of degradation.

Mozie found the teenage girls he used by posing as a benevolent businessman who ran a modeling agency.  He was anything but benevolent and no respectable business would have been named, as his was, "Pretty Pink Pussy Enterprises."  Mozie preyed on vulnerable girls, many of whom were teenage runaways with no money and no shelter.   In return for alcohol, drugs, and a place to stay, the young girls became what he called his "merchandise."

Mozie's brothel business led to a ten-count indictment charging him with eight counts of child sex trafficking, one count of conspiring to commit child sex trafficking, and another count of producing child pornography.  He was convicted on all ten counts and sentenced to life imprisonment.  This is Mozie's appeal in which he raises three challenges to his convictions and two challenges to his sentence.

I.  The Facts as the Victims Knew Them

2

Because there are sufficiency of the evidence challenges, we set out the facts in some detail. The story of James Mozie and his house of ill repute, known by reputation as "the Boom Boom Room," is best told by the teenage victims he recruited to work there. Seven of the eight who were identified in the indictment testified against Mozie at trial. This is their story with the facts taken largely from their testimony.

## A.  Victim M.J.

M.J. was thirteen years old when she ran away from her foster home. She met a man named "Shorty" who told her that he knew of a place where she could stay. That place turned out to be the Boom Boom Room. Thirteen-year-old M.J. met Mozie when she arrived at his home. He told her that his house was "a place where [she] could get off the streets" as long as she stripped and did what he told her to do. M.J. understood that to mean she was to have sex with any of Mozie's customers who paid him for sex with her.

Mozie had M.J. fill out an application form to work for his business, which was identified on the form as "Pretty Pink Pussy Enterprises" (PPP). The form asked the applicant to list the different sexual scenarios in which she would be willing to participate and the sexual acts she would be willing to perform. It asked for her date of birth, and M.J. filled in her birthdate, which showed that she was only thirteen years old. She gave the completed application to Mozie.

3

Within an hour of her arrival at his home, Mozie made M.J. go through "orientation," which is what he called it when a newly arrived girl was required to have sex with him.  He put the thirteen-year-old girl through two other sexual "tryouts," as he called them, to see if she was "good in bed."

M.J. lived at Mozie's house for more than four weeks.  During that time, he not only sexually abused her but also physically abused her.  He hit or choked her at least four separate times and once, when she did not want to do what he said, he cut her arm.

While M.J. was living at the Boom Boom Room, the parties began between 11 p.m. and midnight and lasted until 6 a.m.; they took place six days a week, with Sunday being the only day of rest.  M.J. and about fifteen other females stripped for tips and gave their earnings to Mozie and Laschell Harris, who was his common-law wife and helped him run things.  Of the sixteen females working for Mozie while M.J. lived at his house, about ten were minors.

Before having sex with the girls, the customers paid Mozie directly.  He gave each customer a condom and started an egg timer to count down the thirty minutes for using the girl that each payment purchased.  As an enticement, each customer arriving at the Boom Boom Room received what Mozie called a "Golden Ticket."  It entered the holder in a nightly raffle, the prize being free sex with a girl of the winner's choice.

On an average night at Mozie's house, M.J. had sex with six or seven men. Working six days a week, during her time there she had sex with men more than 140 times. All before her fourteenth birthday.

## B.  Victims C.C. and B.C.

Sixteen-year-old C.C. and her seventeen-year-old sister, B.C., were not runaways. They had a home. One afternoon they were walking down Biscayne Boulevard in Miami to go to their aunt's house when a car driving down the road made a U-turn and stopped in front of them. There were three strangers in the car: Mozie, Harris, and Mozie's sister. Mozie or Harris gave the teenage girls a business card, told them that they had modeling jobs for the two girls, and then offered to drive C.C. and B.C. to their aunt's house. But once the girls were in the car, the adults convinced them to go to TGI Fridays for lunch first. The girls never made it to their aunt's house.

While they were at TGI Fridays, Mozie asked the girls how old they were; they told him their true ages. After C.C. asked Harris about the modeling business, Harris clarified that it was actually more like an escort service. The sixteen-year-old C.C. did not know what that meant, but when her older sister heard that information, B.C.'s "attitude changed" and she "just wanted to go home."

After lunch Mozie and Harris told the girls that they had to make some other stops, and they drove to get gas and to drop off Mozie's sister at her home. After

those stops were made, C.C. fell asleep in the car and Mozie gave B.C. some marijuana to smoke.  B.C. noticed that Mozie was driving them in the opposite direction from her aunt's house, but she was too scared to say anything.  Mozie took the girls to the Boom Boom Room.

When they arrived there, the girls were given PPP applications to fill out.  After looking over the application, B.C. realized the true nature of the business that Mozie was running.  She refused to fill out the application.  Her younger sister, C.C., did fill it out, hoping that if she cooperated Mozie would take her and B.C. home.  She wrote on the application that she was not willing to engage in any sexual acts, but she would be willing to model swimsuits or lingerie.  When C.C. told Mozie that she would not have sex, he tried to persuade the sixteen year old, telling her that "men would want [her] more" because she had recently lost her virginity, and nobody would find out if she had sex with other men.

The girls asked Harris and Mozie to take them home.  Mozie refused, telling his captives that "the party starts tonight."  C.C. and B.C. were told that they had to go through Mozie's "orientation," and they were taken into a room with Mozie and several girls who worked for him.  Those girls explained to C.C. and B.C. how things worked at the house.  Mozie told the two that they would have to have sex with him as part of their orientation, and he directed them to take their clothes off so he could take pictures of them to send to his customers.

6

They asked him for a moment to talk with each other.  Mozie agreed and the girls stepped out of the room, which provided them with an opportunity to escape from the house.  They fled to a nearby store, where they were able to convince a stranger to give them money to catch a bus back to their house.  After taking three different buses, the girls eventually made it home.[1]

### C.  Victim A.M.

A.M. was a sixteen-year-old runaway when she first met Mozie.  She was brought to his house by M.J., who was her cousin.  When A.M. arrived, Mozie approached her and introduced himself.  After he was told her name and age, Mozie gave A.M. a PPP application to complete.  She wrote in the application her true birthdate, which showed that she was a minor.

Once A.M. had filled out the application, Mozie told her that she "had to have sex" with the customers at his house parties.  He also told her to "tell the guys that [she] was 18" because otherwise "they wouldn't want to have sex with [her] because [she] was a minor."

A.M. had sex with three customers during the single night she spent at the Boom Boom Room, including one encounter where she and her cousin M.J.

---

[1] These two girls, like some of the others who testified against Mozie, managed to get away from the Boom Boom Room without having sex with anyone there, but we still refer to them as victims because 18 U.S.C. § 1591(a) makes it a crime to recruit a child for sex trafficking as well as to actually use a child in sex trafficking.  Even the girls who succeeded in escaping Mozie's clutches were victims.

together had sex with one customer.  Mozie paid her more than $200.  The night concluded for A.M. when she went through "orientation," having sex with Mozie.

Later the next morning, Harris woke up A.M. to tell her that her mother was outside looking for her.  Mozie told A.M. that he and Harris would not tell A.M.'s mother that she was at his house.  Harris took A.M. to the back door.  Then A.M. ran away from the house and eventually came across her uncle and stepfather.  They took her back to her mother who contacted the police.

### D.  Victim B.H.

In January 2011 B.H. was sixteen years old.  She ran away from home after her parents found out that she was using drugs and told her that they were going to send her to a drug rehabilitation program in Maine.  She asked a friend for help finding a place to stay.  Instead of helping her, the "friend" brought B.H. to the Boom Boom Room.

Soon after arriving there, B.H. met Mozie.  She told him she was sixteen years old, had run away from home, and needed a place to stay.  Mozie told her that she could stay there "as long as [she] didn't tell anyone how old [she] was." He gave B.H. a PPP application to fill out, and she wrote on it her true birthdate.

After B.H. gave Mozie the completed application, he told her that he wanted to "test the merchandise."  He had B.H. go into his bedroom, where he used a cell phone to take several nude pictures of her for his "client list."  He and Harris

8

instructed her on how to pose.   After Mozie finished taking the photos, he had sex with B.H. while Harris sat on the end of the bed directing the two of them while masturbating.  When Mozie finished, he proclaimed to B.H.:  "I am your pimp now."

B.H. spent four nights at Mozie's house.  While she was there, Mozie gave her alcohol, marijuana, cocaine, and ecstasy, and she had sex with about sixteen different men.  One day she thought she had overdosed on drugs, but she was not taken to the hospital because she and Mozie were afraid that the hospital might call her parents.

Mozie learned that the police were searching for B.H. and he was worried about them finding her at his house.  He told B.H. that if officers ever came there he would tell them that B.H. was dating one of his teenage sons and he was "just a loving father who let [B.H.] stay at the house."  The teenage sons that Mozie spoke of were thirteen and fifteen years old; they lived at the Boom Boom Room and helped Mozie run the brothel by working as security guards and making drinks for customers.[2]  Mozie eventually told B.H. that she had to leave his house because he

_____

[2] There was conflicting testimony about whether the thirteen-year-old boy actually was Mozie's son, as B.H. testified, or instead was Mozie's younger brother as the boy himself testified.  We take the evidence in the light most favorable to the government.  See United States v. Toler, 144 F.3d 1423, 1428 (11th Cir. 1998).  That said, it matters not whether the thirteen-year-old boy Mozie had helping him operate the brothel was his son or his younger brother.  A minor is a minor, and a brothel is a brothel.

had heard that someone had threatened to tell the police she was there.  Before

B.H. left, Mozie told her:  "Don't be a stranger."

## E.  Victim S.H.

S.H. ran away from home when she was seventeen years old.  Her cousin

brought her to Mozie's house.  Like Mozie's other victims, she filled out a PPP

application when she arrived, wrote her true birthdate on it, and gave the

completed form to Mozie.  She saw him reading it.  S.H. then left Mozie's house

for at least a week.  She eventually came back, however, and began working for

Mozie, having sex with approximately twenty men each night during the more than

three months she stayed there before police shut the place down.   In all, she had

sex for hire a total of more than 1,400 times while working for Mozie.  She also

had sex with him while she was there.

## F.  Victim T.P.

T.P was a sixteen-year-old girl attending school near Mozie's house when

someone she knew brought her to the Boom Boom Room to meet him.  T.P. was

not sure why she was there.  Mozie gave her a PPP application and told her to fill it

out.  She filled it out but used a false name because she did not want Mozie to have

information about her.  She did, however, give her true birthdate.  She also told

Mozie directly that she was only sixteen, to which he responded, "Just don't tell

anybody.  It's cool."

10

Mozie then passed T.P. on to Harris, who explained that girls at the house danced and had sex for money. Harris tried to convince her to start working at the house that day, but T.P. resisted. Although she tried to leave, Mozie and Harris would not let her and tried to convince her to stay and work. Mozie also told her that she would have to have sex with him so he could "test the product." After giving Mozie an excuse, she was able to convince him to let her leave. She never returned.

## G. Victim R.M.

R.M. was fifteen years old at the time of Mozie's trial. The prosecution was unable to locate her because she had run away from home; she was the only named victim who did not testify at the trial. In her place, the government called R.M.'s father to testify. Through him, the government introduced a PPP application, which he testified contained his daughter's home address and her Facebook alias, "Adora," in the place where the form called for the applicant's name. The application also contained the day and month of her birth. Although it listed 1993 as the applicant's birth year, it appeared that 1996 had originally been written as the birth year and then had been written over. R.M.'s actual year of birth was 1996, so the alteration made it appear that she was three years older than she actually was.

R.M.'s father also identified his daughter in several photos that featured her both scantily dressed and naked in obscene poses. Those photos had been found on a cell phone that had been recovered from Mozie's house. Although that phone was registered to Harris' son, the phone number was the same one that Mozie had listed on business cards advertising his business. When investigators downloaded the phone's data, they uncovered a lot of text messages advertising the Boom Boom Room and a large number of pictures of naked and scantily clad girls.

## II.  The Evidence Recovered in the Raid

Around 1:00 a.m. on a Saturday night in May 2011, law enforcement officers lowered the boom on the Boom Boom Room, raiding it with a search warrant in hand. They discovered more than a dozen males in the house, as well as four females, two of whom were minors. In the home, the officers seized, among other things, dozens of completed PPP applications, egg timers, handwritten flyers advertising "Cunnilingus Wednesday $30 @ door and all the pussy u can eat (20 min Bom-Bom)" and "Freaky Fantasy Fish Fry Friday," condoms, and a cell phone that was used to advertise the place.

## III.  Procedural History

In September 2011 a grand jury returned a third superseding indictment against Mozie, which charged him with one count of conspiring to commit child sex trafficking in violation of 18 U.S.C. § 1594(c), eight counts of child sex

12

trafficking in violation of 18 U.S.C. § 1591(a), and one count of producing child pornography in violation of 18 U.S.C. § 2251(a). After Mozie's motions to dismiss the indictment were denied, the case went to trial.[3] At the close of the government's case and again at the close of all the evidence, Mozie moved for a judgment of acquittal, which was denied. The jury convicted him of all ten counts and his motions for a new trial were denied. He was sentenced to the guidelines-recommended sentence of life imprisonment.

## IV.  Discussion

Mozie raises three challenges to his convictions and two challenges to his sentence. With regard to his convictions, Mozie contends that:  (1) 18 U.S.C. §§ 1591 and 1594(c) are unconstitutional because they violate the Fifth Amendment's Due Process Clause and the Eighth Amendment, (2) the district court constructively amended his indictment, and (3) the government failed to present sufficient evidence to convict him on any of the charged counts. With regard to his sentence, Mozie contends that it is substantively unreasonable and also that it violates the Eighth Amendment.

### A.  The Challenges to the Convictions

#### 1.  The Constitutional Challenges to 18 U.S.C. §§ 1591 and 1594(c)

---

[3] Harris was indicted as a codefendant, but she decided not to go to trial. Instead, she pleaded guilty to one count of child sex trafficking and was sentenced to 156 months imprisonment.

Mozie contends that we should reverse his convictions on the first nine counts of the indictment because the child sex trafficking statute, 18 U.S.C. § 1591, and its corresponding conspiracy provision, 18 U.S.C. § 1594(c), are facially unconstitutional.[4]  As the United States Supreme Court has observed, a facial challenge is "the most difficult challenge to mount successfully" because it requires a defendant to show "that no set of circumstances exists under which the Act would be valid."  United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100 (1987).

The child sex trafficking statute provides in relevant part:

(a) Whoever knowingly—

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the [victim] has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

---

[4] Mozie's constitutional attack on § 1594(c) rests on the same arguments that he makes in challenging § 1591.  What we say about the constitutionality of § 1591 applies as well to § 1594(c).

14

. . . .

> (c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the [victim] so recruited, enticed, harbored, transported, provided, obtained or maintained, the Government need not prove that the defendant knew that the person had not attained the age of 18 years.

18 U.S.C. § 1591 (emphasis added).

Mozie first argues that § 1591 is facially unconstitutional under the Fifth Amendment's Due Process Clause because it allows the government to obtain a conviction without proving that the defendant actually knew his victim was a minor. He claims that the statute unconstitutionally lowers the government's burden of proof below the beyond-a-reasonable-doubt standard by allowing conviction based on a showing that the defendant only recklessly disregarded the victim's age.

Mozie's argument confuses and conflates mens rea with the burden of proof. The two are not the same thing, much like modeling is not the same thing as prostitution. While the mens rea is an element of a crime, the burden of proof is a measure of how convincing the government's evidence must be to establish an element of the crime. Nothing in § 1591 lowers the government's burden of proof. The government must prove beyond a reasonable doubt all elements of the § 1591 crime, including the mens rea. If the government proves by that standard that the defendant had a reasonable opportunity to observe the victim, it need prove only

15

that he recklessly disregarded the fact that she was under the age of eighteen, not that the defendant knew she was.

Mozie's attack on § 1591's "reckless disregard" language necessarily fails because the Due Process Clause does not prevent Congress from criminalizing conduct that is done with reckless disregard instead of actual knowledge.  As the Supreme Court has held, Congress has "wide latitude . . . to exclude elements of knowledge and diligence from [an offense's] definition."  Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 242, 242 (1957); see also United States v. Balint, 258 U.S. 250, 251–52, 42 S.Ct. 301, 302 (1922) (explaining that due process does not require that statutory crimes include a scienter requirement).

That principle has been applied repeatedly to federal statutory rape laws, which provide an apt comparison here because statutory rape laws generally, and child sex trafficking prohibited by § 1591 in particular, express "congressional recognition that young children need special protection against sexual exploitation."  See United States v. Daniels, 685 F.3d 1237, 1248 n.13 (11th Cir. 2012).  In the statutory rape context, "federal courts uniformly have rejected claims that the Constitution requires the government to prove that a defendant . . . knew that the victim was underage, or that such a defendant has a constitutional right to the defense that he made a reasonable mistake as to the victim's age."  United States v. Wilcox, 487 F.3d 1163, 1174 (8th Cir. 2007); accord United States v.

16

Ransom, 942 F.2d 775, 777 (10th Cir. 1991); Nelson v. Moriarty, 484 F.2d 1034, 1035–36 (1st Cir. 1973) (per curiam); see also Morissette v. United States, 342 U.S. 246, 250–51 & n.8, 72 S.Ct. 240, 243–44 & n.8 (1952) (noting that the common law has always required "[a] relation between some mental element and punishment for a harmful act" but that sex offenses provide an exception to that general rule).  That widely accepted principle applies with equal force in § 1591 cases.

Mozie's second constitutional challenge to § 1591 is that the statute is void for vagueness.  A statute is void for vagueness under the Fifth Amendment's Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 1845 (2008).  Mozie contends that the "reckless disregard" mens rea standard under § 1591(a) and the "reasonable opportunity to observe" language under § 1591(c) are "amorphous evidentiary standards" that are so vague that they violate due process.  He is wrong.

Section 1591(a) provides for criminal sanctions against anyone who "knowingly . . . recruits, entices, harbors, transports, provides, obtains, or maintains . . . a person . . . knowing, or in reckless disregard of the fact, . . . that the person has not attained the age of 18 years and will be caused to engage in a

17

commercial sex act." 18 U.S.C. § 1591(a). That language gave Mozie "fair notice" that his conduct was criminal. See Williams, 553 U.S. at 304, 128 S.Ct. at 1845; see also Colautti v. Franklin, 439 U.S. 379, 395, 99 S.Ct. 675, 685 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea."); Warner v. Zent, 997 F.2d 116, 126 (6th Cir. 1993) (rejecting vagueness challenge to "recklessness" mens rea element).

The phrases "reckless disregard" and "reasonable opportunity to observe" are not "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." See Williams, 553 U.S. at 304, 128 S.Ct. at 1845. Mozie's argument that an ordinary person would not understand what qualifies as "reckless disregard" or a "reasonable opportunity to observe" runs counter to centuries of jurisprudence; those terms are familiar legal concepts that have played an integral role in defining proscribed conduct over the years.

Mozie's third constitutional challenge contends that § 1591 is facially invalid under the Eighth Amendment because it authorizes life imprisonment for reckless conduct. Because this is a facial challenge, Mozie has to convince us that "no set of circumstances exists" in which a life sentence under § 1591 would be valid. See Salerno, 481 U.S. at 745, 107 S.Ct. at 2100. He has not done that. One

18

need look no further than this case to find circumstances in which a life sentence for violating § 1591 is valid and reasonable. See infra Part IV.B.2.

2. The Constructive Amendment Challenge to Nine of the Convictions

Mozie contends that we should reverse his convictions on nine of the ten counts because the district court constructively amended his indictment. We review this issue only for plain error because Mozie did not raise it in the district court. United States v. Dortch, 696 F.3d 1104, 1112 (11th Cir. 2012).

Counts 1 through 9 of the indictment each alleged conjunctively that Mozie both knew and recklessly disregarded the fact that his victims were younger than eighteen years old. The district court, however, tracked the language of the statute and instructed the jury on those counts in the disjunctive, informing the jurors that they could convict Mozie on Counts 1 through 9 if they found that he either knew his victims were minors or recklessly disregarded the fact that they were minors. Instead of being required to find both mental states, the jury was told that either one would be enough to convict, which is what the statutory language says.

The constructive amendment of an indictment circumvents the Fifth Amendment's Grand Jury Clause, and it takes place "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." Id. at 1111 (quotation marks omitted). This may occur when a district court's jury instructions deviate

19

from what is alleged in the indictment.  United States v. Flynt, 15 F.3d 1002, 1005 (11th Cir. 1994).  A constructive amendment is reversible error, at least if the issue is properly preserved.  Id.

Although a constructive amendment may take place where jury instructions diverge from the language in the indictment, we have held again and again that "where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means."  United States v. Simpson, 228 F.3d 1294, 1300 (11th Cir. 2000); Price v. United States, 150 F.2d 283, 285 (5th Cir. 1945);[5] accord United States v. Miller, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815 (1985); United States v. Howard, 742 F.3d 1334, 1343 n.3 (11th Cir. 2014) (collecting cases).  The rule applies not only to alternative acts that satisfy a statutory element, but also to alternative mental states that may satisfy an element.  See United States v. Haymes, 610 F.2d 309, 310–11 (5th Cir. 1980) (finding no constructive amendment where the indictment charged the defendant with transferring funds "in contemplation of bankruptcy proceedings [a]nd with intent to defeat the bankruptcy laws" and the court later instructed the jury in the disjunctive) (emphasis added).

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

That means when a defendant is charged in an indictment conjunctively with alternative means or alternative mental states, any one of which will satisfy an element of the crime, the "jury instruction may properly be framed in the disjunctive" without a constructive amendment taking place. Simpson, 228 F.3d at 1300. This is not only a permissible practice but also a common one. Howard, 742 F.3d at 1343 n.3 ("Prosecutors can and frequently do . . . charge alternative elements in the conjunctive and prove one or more of them in the disjunctive, which is constitutionally permissible."); Simpson, 228 F.3d at 1300. So long as the conviction is based on one of the conjunctively charged means, the trial jury's beyond-a-reasonable-doubt finding will match one of the means that the grand jury has charged based on its probable cause findings. When that happens, the defendant is not convicted on a theory the grand jury did not charge. See United States v. Earls, 42 F.3d 1321, 1327 (10th Cir. 1994). There was no constructive amendment of the indictment in this case.

The primary authority that Mozie relies on is United States v. Cancelliere, 69 F.3d 1116 (11th Cir. 1995), a case in which the defendant had been indicted on two counts charging that he "knowingly and willfully" laundered money. Id. at 1119. At the close of evidence, the government moved to strike "willfulness," which was not a statutory element of the offense or an alternative means of committing it, from the indictment. Id. The district court granted that motion. We

21

later reversed Cancelliere's conviction on those two counts after concluding that the change constituted a constructive amendment. Id. at 1121–22.

The Cancelliere decision is distinguishable on two independently sufficient grounds. One is that the alternative allegation in that case, willfulness, was not an alternative means or mental state contained in the statute. See United States v. Ward, 486 F.3d 1212, 1228 (11th Cir. 2007) (noting that the allegation of willfulness in Cancelliere was "included in the charge by mistake and undeniably was not a necessary element"). In this case, the alternative means and mental states alleged in the indictment were from the statute. The second distinction is that the defendant in that case rested his "whole defense" on disproving the mental state that was stricken. Cancelliere, 69 F.3d at 1122 ("Cancelliere prepared his defense to a charge of 'knowing and willful' money laundering. Indeed his whole defense to this charge rested on his lack of willfulness."). We have suggested in at least one other case that that was the key fact underlying the Cancelliere panel's holding that a constructive amendment had occurred. See Ward, 486 F.3d at 1228. Mozie, by contrast, has not argued that his whole defense rested on establishing, for example, that while he may have acted with reckless disregard of the fact that his victims were minors, he did not actually know that they were. His defense was that he neither knew that they were minors nor acted in reckless disregard of the fact that they were.

To the extent, if any, that <u>Cancelliere</u> supports Mozie's position, it is inconsistent with decisions that came before it.  The <u>Cancelliere</u> decision was issued in 1995, after a number of our decisions on the books had already held that conjunctively charged means or mental states may be proven disjunctively.  See, e.g., <u>Haymes</u>, 610 F.2d at 310 ("It is well-established in this Circuit that a disjunctive statute may be pleaded conjunctively and proved disjunctively."); <u>United States v. Quiroz-Carrasco</u>, 565 F.2d 1328, 1331 (5th Cir. 1978); <u>Cunningham v. United States</u>, 356 F.2d 454, 455–56 (5th Cir. 1966); <u>Heflin v. United States</u>, 223 F.2d 371, 373 (5th Cir. 1955) ("As a general rule, where a statute specifies several means or ways in which an offense may be committed in the alternative, it is bad pleading to allege such means or ways in the alternative; the proper way is to connect the various allegations in the accusing pleading with the conjunctive term 'and' and not with the word 'or.'") (quotation marks omitted); <u>Price</u>, 150 F.2d at 285.  Under the prior panel precedent rule, when two of our decisions conflict, we are obligated to follow the earlier one.  See, e.g., <u>United States v. Madden</u>, 733 F.3d 1314, 1319 (11th Cir. 2013) ("When we have conflicting case law, we follow our oldest precedent."); <u>United States v. Hornaday</u>, 392 F.3d 1306, 1316 (11th Cir. 2004) ("Where there is a conflict between a prior panel decision and those that came before it, we must follow the earlier ones."); <u>Cohen v. Office Depot, Inc.</u>, 204 F.3d 1069, 1072 (11th Cir. 2000) (same).

23

In this case, the conjunctively charged element was that Mozie acted with both knowledge of, and with reckless disregard of, the fact that his victims were minors. In keeping with our precedent, the district court instructed the jury that proof beyond a reasonable doubt of either of those two means would suffice. In doing that, the district court did not impermissibly "broaden the possible bases for conviction" beyond those contained in the indictment. See Dortch, 696 F.3d at 1111 (quotation marks omitted). There was no error, much less plain error.

### 3. The Sufficiency of the Evidence Challenge

As his final challenge to his convictions, Mozie contends that the government presented insufficient evidence to convict him on each of the indictment's ten counts. "We review de novo the sufficiency of the evidence presented at trial, and we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotation marks omitted). "In reviewing the sufficiency of the evidence, we look at the record in the light most favorable to the verdict and draw all reasonable inferences and resolve all questions of credibility in its favor." Id. (quotation marks omitted).

### a. The Substantive § 1591 Counts

In order to convict Mozie on the substantive counts (Counts 2 through 9) underlying the conspiracy, the government had to prove three elements: (1) he

24

knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means each victim; (2) he knew, or recklessly disregarded the fact, that each victim was a minor and would be caused to engage in a commercial sex act; and (3) his acts were in or affected interstate or foreign commerce. See 18 U.S.C. § 1591. As we have already noted, to establish the second element, the requisite mens rea, the government did not have to prove that Mozie "knew" his victims were minors; it could instead prove the alternative that he "had a reasonable opportunity to observe" the victims and "recklessly disregard[ed]" their age. Id. § 1591(c). Mozie challenges the sufficiency of the second element as to some of the counts and the first element as to others, but he does not question the sufficiency of the evidence proving the third element for any of the counts.

Mozie argues that his convictions on Counts 2, 3, and 4 should be set aside because the government did not put forward enough evidence that he knew the victims named in those counts (M.J., S.H., and A.M., respectively) were minors. This argument is frivolous. As for Count 2, M.J. testified at trial that she was thirteen years old when she met Mozie and that she wrote down her true birthdate when she filled out her PPP application and gave it to him. As for Count 3, S.H. testified that she began working for Mozie when she was seventeen, that she put her true birthdate on her PPP application, and that she saw him review it. As for Count 4, A.M. testified that she was sixteen when she began working for Mozie

25

and that he told her to "tell the guys that [she] was 18, because if [she] didn't, they wouldn't want to have sex with [her] because [she] was a minor." There was plenty of evidence to convict Mozie on Counts 2 through 4.

Count 5 covered Mozie's conduct regarding B.H. She testified that she told Mozie she was sixteen when she met and started working for him, and that he told her she could stay if she did not tell anyone her age. Still, Mozie argues that the evidence actually disproved the charge in this count because it showed that B.H. had worked as a prostitute before he met her and, therefore, he did not recruit her into prostitution. But the statute also applies to anyone who "harbors" a minor who "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). B.H. testified that she stayed at Mozie's house for five days and four nights while she worked as a prostitute for him. That evidence is sufficient to convict Mozie on Count 5.

Mozie challenges his convictions on Counts 6 (B.C.), 7 (C.C.), and 8 (T.P.), arguing that there was insufficient evidence that the victims in those counts actually engaged in commercial sex acts. The legal premise of this challenge is that the statute requires that the minor have engaged in a commercial sex act. It does not. See id. § 1591. It is enough that Mozie "recruited" the victims in Counts 6 through 8 to engage in commercial sex acts even though they did not actually do so. See id. And that is what the evidence showed. The victims in Counts 6 and 7

26

were B.C. and C.C.  They testified that Mozie gave them business cards advertising his PPP business, that Mozie's wife told them in his presence that the business was an escort service, and that Mozie took them to his house where he gave them PPP applications to fill out, the sole purpose of which was to have them engage in commercial sex acts.  Both victims also testified that they told Mozie they were sixteen (C.C.) and seventeen (B.C.) years old at the time.  That was enough evidence to convict Mozie on Counts 6 and 7.

The victim in Count 8, T.P., testified that Mozie gave her a PPP application to work as a prostitute after she arrived at his house and had told him that she was sixteen years old.  She also testified that he told her that she would be required to have sex with him so he could "test the product."  That evidence was enough to convict Mozie on Count 8.

Mozie's final insufficiency argument involving a substantive count is that there was not enough evidence to convict him on Count 9 (R.M.).  Although R.M. did not testify at trial, the government presented enough evidence for a reasonable jury to conclude that Mozie recruited her, like the other victims, to work at his brothel.  R.M.'s father testified at trial that his daughter was fifteen years old at the time of Mozie's trial.  The government introduced a PPP application, purportedly filled out by R.M., and her father testified that the application contained the name she used on Facebook, her home address, and the correct day and month of her

27

birthday.  The PPP application listed 1993 as her birth year, but it appeared that 1996 had been written on the application initially and then altered to cover up her status as a minor.  R.M.'s father also identified his daughter in photos found on a cell phone recovered from Mozie's home.  Some of those photos depicted R.M. naked in obscene poses, and there was other evidence that Mozie had the girls he was using as prostitutes pose naked for marketing purposes.  The overall evidence, when viewed in the light most favorable to the verdict, was sufficient for a reasonable jury to find that Mozie had recruited R.M., just like his other victims, to engage in a commercial sex act even though he knew, or recklessly disregarded the fact, that she was a minor.

### b. The Conspiracy Count

To convict Mozie on the conspiracy charge, contained in Count 1, the government had to prove that (1) two or more persons agreed to violate § 1591, (2) Mozie knew of that conspiratorial goal, and (3) he voluntarily assisted in accomplishing that goal.  See 18 U.S.C. § 1594(c); United States v. Jones, 913 F.2d 1552, 1557 (11th Cir. 1990).  The existence of an agreement may be inferred from the participants' conduct.  See Jones, 913 F.2d at 1557.

Some of the victims testified at trial about how Mozie acted in concert with Harris to recruit them to work at the Boom Boom Room.  The evidence also established how some of Mozie's family members helped him operate the brothel,

sometimes serving food and drinks to customers.  That evidence, coupled with the testimony from individual victims about how Mozie personally recruited them to work as prostitutes, was sufficient for a reasonable jury to infer that Mozie knowingly and voluntarily entered into an agreement with others to violate § 1591.

### c.  The Child Pornography Count

To convict Mozie on the child pornography charge in Count 10, the government had to prove (1) that he employed, used, persuaded, induced, enticed, or coerced R.M. to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct, (2) that R.M. was a minor at the time, and (3) the depiction was produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means.  See 18 U.S.C. § 2251(a).  The basis for Mozie's challenge to his conviction on Count 10 is that no witness testified that Mozie took the sexually explicit photos of R.M. that were on the cell phone recovered from his home.  That argument is unconvincing.

The government was not required to prove that Mozie personally took the sexually explicit photos of R.M. that were presented at trial.  It had to prove only that he persuaded or induced R.M. to engage in sexually explicit conduct for the purpose of creating an image of that conduct.  See 18 U.S.C. § 2251(a).  The government put forward plenty of evidence for a reasonable jury to find that.

As mentioned earlier, R.M.'s father identified her in photos that were found on a cell phone taken from Mozie's house, and some of those photos featured a nude R.M. in obscene poses.  FBI Agent Dereck Farinha testified that while the cell phone was not on Mozie's person during the raid of the Boom Boom Room, he did find it in the same room in which he found Mozie.  The number for the phone was also listed on business cards advertising the brothel.  Another one of Mozie's victims, B.H., testified that Mozie had taken explicit photos of her using a cell phone, and those photos were found on the same cell phone that contained the explicit pictures of R.M.  Finally, two other victims, B.C. and C.C., testified that Mozie had told them he would be taking topless photos of them after they had filled out their PPP applications.  Based on that evidence, a reasonable jury could have found, as the jury in this case obviously did, that Mozie persuaded or induced R.M. to engage in sexually explicit conduct for purposes of producing the images presented at trial.  Count 10, like the other nine counts in the indictment, was supported by sufficient evidence.

## B.  The Challenges to the Sentence

### 1.  Substantive Reasonableness

Mozie challenges his life sentence as substantively unreasonable.  He points to Harris' 156-month sentence and contends that his own life sentence resulted in an unwarranted sentencing disparity.  He also claims that his sentence was

unreasonable because of the lack of evidence that he had caused physical or emotional harm to his victims, as well as the fact that he was not charged with a weapons or controlled substance offense.

We review the reasonableness of a sentence for an abuse of discretion. Daniels, 685 F.3d at 1244–45. We look at the totality of the circumstances, United States v. Saac, 632 F.3d 1203, 1212 (11th Cir. 2011), keeping in mind that "when the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one," United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). A sentencing court's task is to determine an appropriate sentence in light of the factors listed in 18 U.S.C. § 3553(a). See United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). The court abuses its discretion in imposing a sentence if "it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). A clear error of judgment occurs if the court "considers the proper factors but balances them unreasonably." Id. We will not disturb a sentence unless we are "left with the definite and firm conviction that the district court committed a clear error of judgment." Id. at 1190 (quotation marks omitted).

31

The district court did not abuse its discretion by imposing a life sentence. Mozie's recommended sentence under the sentencing guidelines was life imprisonment, and there is nothing in the record indicating that the district court did not consider the § 3553(a) factors or that it unreasonably balanced those factors.

Mozie's argument that his sentence is unreasonably high because of the lack of evidence that his teenage victims suffered physical or emotional harm is itself unreasonable. Sexual crimes against minors cause substantial and long-lasting harm, and "[m]uch has been said to describe and emphasize [that] grave harm." Id. at 1207. For example, "[i]t has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults." New York v. Ferber, 458 U.S. 747, 758 n.9, 102 S.Ct. 3348, 3355 n.9 (1982). Simply stated, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or humane society can tolerate." Kennedy v. Louisiana, 554 U.S. 407, 468, 128 S.Ct. 2641, 2677 (2008) (Alito, J., dissenting) (quotation marks omitted). Recall that because of Mozie's criminal conduct M.J., a thirteen year old, had sex with men 140 times during the four weeks she was in his brothel; S.H., a seventeen year old, had sex with men more than 1,400 times during the three months she was there.

32

"Because the punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be." Irey, 612 F.3d at 1206.  And we have recognized that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." United States v. Sarras, 575 F.3d 1191, 1220 (11th Cir. 2009).  For that reason, we have repeatedly upheld "severe sentences in these cases." United States v. Pugh, 515 F.3d 1179, 1202 (11th Cir. 2008).  As one of Mozie's victim's, T.P., stated, "a person shouldn't be doing [what he did] to children."

Mozie's claim that the district court did not give sufficient consideration to § 3553(a)(6), which requires courts to consider avoiding unwarranted sentence disparities among similarly situated defendants, is also unconvincing.  In arguing that the court created an unwarranted disparity, Mozie points to the 156-month sentence that Harris received for her role in running the Boom Boom Room.  "A well-founded claim of disparity, however, assumes that apples are being compared to apples," United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009) (quotation marks omitted), and in Mozie's argument they are not.  We have held that "defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial." Id.  Harris pleaded guilty and cooperated

33

with the government.  Mozie did not.  Mozie was the ringleader of the whole

sordid enterprise.  Harris was not.  An unwarranted disparity there is not.

## 2.  The Eighth Amendment

Mozie also challenges his sentence under the Eighth Amendment,

contending that it is grossly disproportionate to his offenses because he did not

employ coercion, violence, or the threat of violence to persuade his victims to work

as prostitutes.  While we usually review de novo an Eighth Amendment challenge

to a sentence, our review is limited to plain error when, as here, the defendant

failed to object on those grounds in the district court.  United States v. McGarity,

669 F.3d 1218, 1255 (11th Cir. 2012).

"In non-capital cases, the Eighth Amendment encompasses, at most, only a

narrow proportionality principle."  United States v. Raad, 406 F.3d 1322, 1323

(11th Cir. 2005) (quotation marks omitted).  It "does not require strict

proportionality between crime and sentence" but instead "forbids only extreme

sentences that are grossly disproportionate to the crime."  United States v. Farley,

607 F.3d 1294, 1341 (11th Cir. 2010) (quotation marks omitted).  "[O]utside the

context of capital punishment, successful challenges to the proportionality of

particular sentences [are] exceedingly rare."  Solem v. Helm, 463 U.S. 277, 289–

90, 103 S.Ct. 3001, 3009 (1983) (emphasis omitted).  We give "substantial

34

deference to Congress" in determining the types and limits of punishments for certain crimes.  Raad, 406 F.3d at 1323.

Mozie's Eighth Amendment challenge fails under any standard because his sentence was not grossly disproportionate to his crimes.  The Supreme Court has upheld against Eighth Amendment attack a life sentence for criminal conduct no more serious than Mozie's.  See Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991) (plurality opinion) (upholding mandatory sentence of life without parole for defendant convicted of possessing 672 grams of cocaine who had no prior felony convictions).  In the specific context of child sex crimes, we and other courts of appeals have affirmed life sentences that were attacked on Eighth Amendment grounds.  See, e.g., McGarity, 669 F.3d at 1255–57 (upholding guidelines-recommended life sentences for defendants convicted of running child pornography ring); United States v. Cephus, 684 F.3d 703, 709 (7th Cir. 2012) (rejecting Eighth Amendment attack on life sentences imposed for engaging in sex trafficking of minors).

Mozie's claim that his punishment is disproportionate because he did not use coercion, violence, or the threat of violence stands on flawed factual and legal grounds.  Factually, the evidence at trial showed that Mozie did employ some coercion and violence to run his brothel.  He struck and choked M.J. when she did not follow his commands, and he essentially kidnapped C.C. and B.C. to bring

35

them to his house.  Legally, even if Mozie had not used any violence or coercion, the "absence of violence in the crimes being punished [is] not determinative of the disproportionality issue because 'the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal.'"  Farley, 607 F.3d at 1337 (quoting Rummel v. Estelle, 445 U.S. 263, 275, 100 S.Ct. 1133, 1140 (1980)).  Society has a strong interest in deterring individuals from sexually exploiting children and in punishing those who do.  Given the seriousness of his crimes, Mozie's sentence was not grossly disproportionate to his crimes and it does not violate the Eighth Amendment.[6]

    **AFFIRMED.**

---

[6] Mozie also contends that the district court abused its discretion in denying his motion for a new trial based on newly discovered evidence.  To prevail on that motion, he had to establish, among other things, that the newly discovered evidence was not discovered until after trial.  United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir. 2003).  Mozie's motion was based on a pretrial disclosure from the government that he conceded his attorney had an opportunity to review before trial.  There was no abuse of discretion in denying the motion.