[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13449
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cr-20632-RNS-1


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

CHRISTOPHER R. GLENN,
a.k.a. Fernando Albergue,
a.k.a. Derek John Michael,
a.k.a. Yusef,
a.k.a. El Gringo,

                                        Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(December 23, 2020)

Before WILLIAM PRYOR, Chief Judge, NEWSOM and BRANCH, Circuit
Judges.

PER CURIAM:

This appeal requires us to review the convictions and sentence of a government contractor who sexually exploited young, impoverished girls in Honduras. A jury convicted Christopher Glenn of sexual assault of a minor, child sex trafficking, travel with intent to engage in illicit sexual conduct, and possession of child pornography. The district court sentenced him to life imprisonment. He asks us to vacate his convictions on the grounds that the jury instructions constructively amended his indictment, the prosecutor and the district court misled the jury about the definition of a commercial sex act, the prosecutor misstated the law during closing argument, and insufficient evidence supports his convictions. He also asks us to vacate his sentence as substantively unreasonable. We conclude that the jury instructions did not constructively amend the indictment, the prosecutor and the district court did not mislead the jury, the prosecutor's closing argument was proper, sufficient evidence supports the convictions, and the sentence is reasonable. We affirm.

## I. BACKGROUND

Christopher Glenn is an American citizen who was born in the United States and raised in upstate New York. He speaks English, Spanish, and Arabic. For years, he worked overseas as a civilian contractor for the federal government. Most of the crimes for which he was later convicted occurred while he worked in

2

Honduras, first between December 2009 and December 2010, and again between February 2012 and October 2012. He worked as a computer network administrator for the United States Army, Southern Command, Joint Task Force Bravo, at Soto Cano Air Base outside the city of Comayagua. Throughout this period, Glenn was married, but his wife lived in the United States and she visited him only once in Honduras in January 2010.

In February 2010, during his first work assignment in Honduras, Glenn published advertisements for employment as a live-in housekeeper. The advertisements targeted teenage girls. They promised a salary—4,000 lempiras, or roughly $200, a month—and benefits, including medical insurance, meals, and other expenses. Interested applicants were directed to contact a woman named Lucia.

In response to one of these advertisements, a Honduran woman dropped off her two daughters, 16-year-old Minor I and 13-year-old Minor D, at Lucia's house for a job interview. A third applicant, 14-year-old Minor K, was also present. Lucia explained to the girls that they would work for a man named "Youssef" and that they would clean his house and prepare his meals. Lucia said that Youssef wanted girls who were unmarried and without children. These requirements seemed strange for a housekeeping job, but the girls needed the money. Eventually, Lucia

3

called Youssef—in reality, Glenn—who came over to Lucia's house and then drove the girls to his home.

The girls stayed with Glenn for about 15 days. He told them that he was from Iraq, and he required them to wear conservative clothing and headscarves and to pray with him. While he was at work, the girls cleaned the house and watched television. When he came home in the evening, they prepared his meals. They could not go outside because he locked the gate behind him when he left for work. And they could not contact the outside world because he did not leave them with a telephone.

Minor I and Minor D remembered at least two strange incidents from their time with Glenn. On one occasion, Glenn told the girls that he needed to perform a "medical examination" for their employee health insurance. He sent each girl, one at a time, into his bedroom. He told each to take off her clothes, then he fondled her breasts and inserted a long cotton swab into her genitals. On another occasion, Glenn gave the girls pills, which he said were vitamins. The girls ingested them and felt dizzy. Minor I remembered Glenn taking her and the other girls upstairs, but she had no memory of what happened afterward.

While Minor I was cleaning Glenn's house one day, she discovered papers containing the names of Minor D and Minor K. She confronted Glenn, who admitted the documents were marriage contracts. He stated that he wanted to marry

4

Minor D or Minor K, and he asked for Minor I's help in convincing her sister to accept his proposal. Minor I refused because her sister was too young to marry.

About fifteen days after Glenn first brought the girls to his home, he said that he had to go away on a trip, and he drove them back to their families. When he reached Minor I and Minor D's home, he spoke with their mother and offered her money in exchange for allowing him to marry Minor D. The mother refused, so Glenn left.

Sometime later, Glenn came back to Minor I and Minor D's home. He was accompanied by a 15-year-old girl, Minor F, whom he introduced as his new wife. He asked Minor D to come back and work for him so that she could help Minor F with the household chores. Minor D agreed because she needed the money. She lived with Glenn for another 15 days, during which time, she says, he treated her like an employee, unlike her first experience.

Minor F and her mother allege that Glenn paid their family a dowry of 30,000 lempiras, or about $1,500. According to Minor F, she had a small wedding ceremony at Glenn's house, conducted in Arabic and translated into Spanish. She lived with Glenn between one and two months before she left him and returned home because she was unhappy. Glenn later "divorced [her] in words."

When Glenn returned to Honduras in 2012, he used a new strategy to recruit a 15-year-old girl, Minor A, to marry him. In April 2012, Glenn and his neighbor,

5

Juán Ángel García Velásquez, drove about five hours from Comayagua to the municipality of Yorito. While Glenn waited in his car, García Velásquez met with Minor A's parents and told them that he wanted to hire their daughter to care for his sick mother at Lake Yojoa. He offered to pay the parents 2,000 lempiras a month. Minor A's parents accepted, and Minor A left with García Velásquez and Glenn that evening. But instead of driving to Lake Yojoa, as García Velásquez had told Minor A's parents they would, they drove to Comayagua, where García Velásquez and Glenn lived. García Velásquez introduced Minor A to Glenn and said that he spoke only Arabic. Minor A spent her first night in Comayagua at García Velásquez's house.

The next day, Glenn came over to García Velásquez's home at lunchtime. Glenn and García Velásquez called Minor A's father and allowed her to speak with him. Afterward, García Velásquez told Minor A that her father had given his permission for her to marry Glenn. But Minor A had overheard no such conversation. Confused, she nevertheless followed García Velásquez's instructions and changed into an outfit that he had bought for her. García Velásquez then performed a ceremony in Arabic. He asked Minor A to take Glenn's hand and repeat some words she did not understand. After the ceremony, García Velásquez gave her pills that he said were vitamins. Minor A took them and felt sleepy. After García Velásquez left her alone with Glenn, she again asked to speak to her father.

6

Glenn responded in Spanish—the first time that he had spoken to Minor A in her own language—that he did not have her father's phone number. Soon thereafter, Minor A fell asleep. She woke up the next morning alone, but she could tell that she had lost her virginity while she slept.

After their "wedding night," Glenn slept in the same bed as Minor A and forced her to have sexual intercourse. She would sometimes say no, but she stopped refusing after Glenn hit her. At first, he did not allow her to call her parents, but when her mother called the police, he took her back home. During that visit, he offered her parents 15,000 lempiras. They accepted, and in return they allowed Glenn to keep their daughter. Minor A continued to live with Glenn for about a year, after which she left him and returned home.

During their one-year "marriage," Glenn asked Minor A to accompany him and García Velásquez on trips to recruit other girls. On one such trip, Minor A helped to recruit Minor B, who was younger than her. Minor B's experience was nearly identical to Minor A's. García Velásquez allowed her to speak briefly with her mother over the phone, then told her that her mother had consented to her marrying Glenn. García Velásquez and Glenn performed a "wedding" ceremony, after which they gave Minor B some pills. But Minor B would not stop crying, so Glenn and García Velásquez took her back to her home after only two nights away.

7

Minor A also accompanied Glenn and García Velásquez on a trip to a remote village to recruit Minor G, who was 15 years old. They brought food for a family meal, and Minor A brought lotions and perfume to give to Minor G. García Velásquez told Minor G's parents that he wanted their daughter to take care of his sick mother, and he offered them 3,000 lempiras a month. When Minor G's parents said no, García Velásquez increased the offer to 15,000 lempiras a month, but they still turned him down. Later that evening, Minor G's mother cooked dinner using the food that García Velásquez had brought them. Glenn, who had been waiting in the car, joined them, but he did not speak throughout the meal. After dinner, García Velásquez asked Minor G's parents one last time to reconsider, and their answer was still no. Someone then suggested that Minor G's 14-year-old cousin, Minor H, might be suitable for the job. García Velásquez and Minor A went to see Minor H, and García Velásquez offered her 3,000 lempiras a month, but she also turned down the job.

In addition to recruiting trips, Glenn sometimes took Minor A to stay at the Intercontinental Hotel in Tegucigalpa. On May 5, 2012, he filmed a video of Minor A in their hotel room where she appeared unfamiliar with and excited about indoor plumbing and electricity. Glenn flew from Tegucigalpa to Miami on May 12, and he flew back to Tegucigalpa on May 19. He and Minor A stayed at the Intercontinental Hotel again from May 26 to May 28, during which time he

8

secretly filmed videos of Minor A sitting naked in the bathtub. Minor A says that every time she and Glenn stayed at the hotel, they had sexual intercourse.

Glenn stopped working as a government contractor in October 2012, but he remained in Honduras. A year later, the Federal Bureau of Investigation and the Honduran national police began investigating him for possible involvement in human trafficking. They surveilled his house and talked to his neighbors and victims, including Minor A. They later executed a search warrant of his house in Comayagua. Inside, they found two girls, including 16-year-old Minor J. They also found sedative pills.

The Bureau searched Glenn's computer hard drive and found numerous files that corroborated the stories told by Glenn's victims, including videos of Minor A, draft marriage contracts, and fake medical questionnaires. It also found child pornography, including photographs from 2004 depicting a girl, Minor C, engaged in sexual acts with Glenn. The Bureau tracked down Minor C, who was from Mexico, and discovered that she was 16 years old at the time the photos were taken.

A federal grand jury indicted Glenn for one count of sexual assault of a minor, 18 U.S.C. § 2243(a); two counts of sex trafficking by fraud or of a minor, *id.* § 1591(a)(1), along with four counts of attempted sex trafficking, *id.* §§ 1591(a)(1), 1594(a), and two counts of conspiracy to engage in sex trafficking,

9

*id.* §§ 1591(a)(1), 1594(c); one count of travel with intent to engage in illicit sexual conduct, *id.* § 2423(b); and one count of possession of child pornography, *id.* § 2252(a)(4)(A). As charged in the indictment, federal law made it a crime to recruit, entice, harbor, or transport a person "knowing, or in reckless disregard of the fact, that . . . fraud . . . will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." *Id.* § 1591(a)(1) (2012). A "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3). The United States Attorney later dismissed one of the counts of attempted sex trafficking, leaving a ten-count indictment against Glenn.

The district court conducted a 24-day jury trial. Glenn represented himself throughout most of his trial, with the assistance of stand-by counsel. The jury heard testimony from Minor D, Minor I, Minor F and her mother, Minor A, Minor G, and Minor H. After the government rested, Glenn moved for a judgment of acquittal on four of the counts, which the district court denied. Glenn renewed his motion at the close of evidence. The district court denied it except as to the two charges of attempted sex trafficking involving Minor G and Minor H, which it reserved until after the jury verdict.

10

During the conference on jury instructions, Glenn asked the district court to provide the jury with a "marriage defense" to the charges of sex trafficking: "If you find that Christopher Glenn was either married, by common law or a religious marriage, or engaged in consensual sex with an individual 16 years of age or older, then you must find him not guilty of commercial sex acts." He also asked the district court to include, in parentheses, the word "prostitution" next to the term "commercial sex act." The district court denied both requests. It instructed the jury that a commercial sex act "means any sex act, on account of which anything of value is given to or received by any person."

The district court also instructed the jury that for it to find Glenn guilty of sex trafficking by fraud or of a minor the government had to prove beyond a reasonable doubt that he "knew, or was in reckless disregard of the fact, that either (a) means of fraud would be used . . . or (b) the person had not attained the age of 18 years." The district court explained that "[i]f the Government proves beyond a reasonable doubt that [Glenn] had a reasonable opportunity to observe the [victim], then the Government does not have to prove that [Glenn] knew that the person had not attained the age of 18 years." Glenn did not object to this instruction.

During her closing argument, the prosecutor explained to the jury that Glenn did not have to be involved in prostitution for him to be guilty of causing minors to commit commercial sex acts. She said that "sex trafficking does not need to

11

involve prostitution. It may. In this case, it does not." And she went on to explain that "a commercial sex act does not have to be prostitution. And this case in fact is not about prostitution."

The prosecutor also addressed the charge that Glenn traveled from the United States to Honduras on May 19, 2012, with the intent to engage in illicit sexual conduct with Minor A. 18 U.S.C. § 2423(b). She told the jury that "if you are traveling from the United States to another country, even if you're residing over there, but . . . one of your purposes is to sexually exploit or engage in sex trafficking, you can be charged with [violating section 2423(b)]." Glenn did not contemporaneously object to that statement.

The jury found Glenn guilty of eight of the ten counts: sexual assault of Minor D; sex trafficking of Minor A; attempted sex trafficking of Minor D, Minor G, and Minor H; conspiracy to engage in sex trafficking between March 2012 and February 2014; travel to engage in illicit sexual conduct; and possession of child pornography. It found him not guilty of sex trafficking of Minor F and of conspiracy to commit sex trafficking between February 2010 and June 2010. The district court then denied Glenn's motion for a judgment of acquittal as to the two counts of attempted sex trafficking that it had not previously ruled upon.

Glenn's base offense levels under the Sentencing Guidelines ranged from 18 to 34. He received two-level enhancements because his victims were in his

custody, care, or supervisory control; he knowingly misrepresented his identity; he obstructed justice; he knowingly engaged in the distribution of child pornography; some of his victims were at least 12 but younger than 16 years old; and his child pornography offense involved a computer and 30 images. He also received four-level enhancements because he was the organizer of criminal activity that involved five or more participants and his offenses involved aggravated sexual abuse. 18 U.S.C. § 2241(a)–(b). He received a five-level enhancement because he had engaged in a pattern of behavior involving the sexual abuse or exploitation of a minor. Finally, he received a four-level adjustment for multiple counts and another five-level enhancement because he engaged in a pattern of activity involving prohibited conduct. His total offense level was 55, which the guidelines treat as the maximum offense level of 43. Glenn's guideline-sentencing range was life imprisonment.

The district court sentenced Glenn to life imprisonment for each count of sex trafficking, attempted sex trafficking, and conspiracy to commit sex trafficking, along with concurrent sentences of 180 months for sexual assault, 360 months for travel with the purpose of engaging in illicit sexual conduct, and 120 months for possessing child pornography. It explained that it had determined an appropriate sentence by considering "the statements of the parties, the presentence investigation report[,] . . . the advisory guidelines, [and] the statutory factors." *See*

13

18 U.S.C. § 3553(a). It began with the fact that Glenn had committed "very serious offenses involving the sexual abuse of minors," many of them while he was a guest in Honduras working on behalf of the federal government. It reasoned that when foreign governments "allow our military and their civilian support staff to come into their countries to work, . . . they have to know that if one of those people preys upon their citizens, then our country is going to take strong actions against our own citizens." So the sentence needed to deter "other people who are thinking of engaging in these kind[s] of activities." The district court also explained that it had to consider "the protection of the public." Glenn's victims were poor young girls, some of whom "did not even know how to spell their own names." The district court described the video of Glenn showing Minor A how indoor plumbing works as "haunting." Moreover, Glenn had "not shown any remorse," he had "no concept of how horrible [his] actions were and how wrong they were," and he "continually blame[d] everyone and everything but [himself] for all the harms" that he caused. The district court believed that even if Glenn were released from prison in about 50 years at the age of 85, he would still be a danger to society.

## II. STANDARD OF REVIEW

We review unpreserved issues for plain error. *United States v. Flanders*, 752 F.3d 1317, 1332–33 (11th Cir. 2014); *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013). We review the refusal to give a requested jury instruction

14

for abuse of discretion. *United States v. Rutgerson*, 822 F.3d 1223, 1236 (11th Cir. 2016). We review the sufficiency of evidence *de novo* and view the evidence in the light most favorable to the government. *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005). We review the reasonableness of a sentence for abuse of discretion. *United States v. Williams*, 526 F.3d 1312, 1321 (11th Cir. 2008).

### III. DISCUSSION

Glenn argues that the jury instructions constructively amended his indictment; that the district court and the prosecutor improperly conflated a "commercial sex act" with prostitution; that the prosecutor misstated the law with respect to the travel-with-intent charge during her closing argument; that three of his convictions were not supported by sufficient evidence; and that his sentence of life imprisonment is unreasonable. We address each issue in turn. We do not address his argument that the statutes of conviction are unconstitutional as applied because he raised this issue in a perfunctory manner and without any citations to legal authority. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

*A.  The Jury Instructions Did Not Constructively Amend the Indictment.*

The Fifth Amendment provides, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend. V. "A fundamental principle stemming from

15

this amendment is that a defendant can only be convicted for a crime charged in the indictment. . . . When a defendant is convicted of charges not included in the indictment, an amendment of the indictment has occurred." *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). An amendment of the indictment happens "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *Id.* at 634. It is "*per se* reversible error." *Id.* at 633.

Glenn argues that the district court constructively amended his indictment because it told the jury that the government did not have to prove that Glenn "in fact knew that the [victim] had not attained the age of 18 years" if she proved beyond a reasonable doubt that he "had a reasonable opportunity to observe the [victim]." According to Glenn, this instruction added an independent basis of liability for section 1591 because it meant that the prosecutor satisfied her burden if she proved one of three facts: that Glenn knew that his victim was under 18; that he acted with reckless disregard to that fact; or that he had a reasonable opportunity to observe his victim. Because the indictment discussed only the first two options—knowledge or reckless disregard—Glenn argues that the district court constructively amended the indictment by adding reasonable opportunity to observe as an alternative means of obtaining a conviction.

16

The district court did not constructively amend Glenn's indictment because the jury instructions accurately stated the law when Glenn committed his offenses. Section 1591(a)(1) defines the following offense: "Whoever knowingly . . . recruits, entices, harbors, . . . or maintains by any means a person . . . *knowing, or in reckless disregard of the fact*, that . . . fraud . . . will be used . . . or that the person has not attained the age of 18 years . . . shall be punished . . . ." 18 U.S.C. § 1591(a)(1) (2012) (emphasis added). So the government had to prove Glenn's *mens rea* by presenting evidence that either he *knew* that fraud would be used or that the victim was a minor, or that he *recklessly disregarded* these facts. *See United States v. Whyte*, 928 F.3d 1317, 1328 (11th Cir. 2019). When Glenn was indicted, subsection (c) provided, "In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the [victim], the Government need not prove that the defendant knew that the person had not attained the age of 18 years." *Id.* § 1591(c) (effective language Dec. 23, 2008, to May 28, 2015). In dicta in *United States v. Mozie*, we stated that section 1591(c) means that if the government proves beyond a reasonable doubt "that the defendant had a reasonable opportunity to observe the victim, it need prove only that he recklessly disregarded the fact that she was under the age of eighteen, not that the defendant knew she was." 752 F.3d 1271, 1282 (11th Cir. 2014). We later explained that "we read [this] version of subsection (c) as governing when the

17

government may proceed under a theory of reckless disregard instead of actual knowledge." *Whyte*, 928 F.3d at 1329. Glenn's jury instructions conformed to this interpretation.

Glenn argues that our precedent forecloses this interpretation, but the decision he cites involved an amended version of section 1591(c). In *United States v. Whyte*, we held that "section 1591(c) unambiguously creates an independent basis of liability when the government proves a defendant had a reasonable opportunity to observe the victim." *Id.* at 1330. But the version of section 1591(c) that we reviewed in *Whyte* included an amendment by Congress in 2015. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 108(a)(3)(B), 129 Stat. 227, 239 (codified at 18 U.S.C. § 1591(c)). The amended version provides, "In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the [victim], the Government need not prove that the defendant knew, *or recklessly disregarded the fact*, that the person had not attained the age of 18 years." 18 U.S.C. § 1591(c) (effective language since May 29, 2015) (emphasis added). We acknowledged in *Whyte* that the amendment of section 1591(c) superseded our interpretation of that provision in *Mozie*. *Whyte*, 928 F.3d at 1330. Because Glenn was indicted under the previous version of section 1591(c), *Whyte* is irrelevant to our analysis.

18

The other opinions cited by Glenn do not support his argument. They involved jury instructions that made a reasonable opportunity to observe the victim an independent basis of liability, which constructively amended the indictments. *United States v. Roberts*, 770 F. App'x 563, 566–67 (11th Cir. 2019); *United States v. Davis*, 854 F.3d 601, 604 (9th Cir. 2017). Those decisions do not help Glenn because the jury instructions in his trial did not identify a reasonable opportunity to observe the victim as an independent basis of liability.

### B.  The Term "Commercial Sex Act" Is Broader than Prostitution.

Glenn asserts that "[t]he jury was deliberately misled to believe that [he] could commit commercial sex acts without engaging in prostitution." He appears to allege both prosecutorial misconduct and improper jury instructions. He contends that the prosecutor confused the jury by leading it to believe that "commercial sex acts" are distinguishable from prostitution. And he argues that the district court erred by refusing to instruct the jury that a commercial sex act is equivalent to prostitution.

These arguments fail because the statutory definition of "commercial sex act" covers more conduct than just prostitution. Section 1591(e)(3) defines a commercial sex act as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Glenn offered money to his victims and their families so that he could engage in sexual acts with them. His

19

conduct is prohibited by the plain terms of the statute, which do not require the victim to be a prostitute.

Glenn unpersuasively argues that the statutes of conviction do not apply to his conduct because they "were intended to criminalize and target child prostitution." Even if his assertion about the purpose of the statutes were true, we are bound by the text of those laws, not by any unstated intents. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 2, at 57 (2012) ("[P]urpose—even purpose as most narrowly defined—cannot be used to contradict text or to supplement it."). Moreover, we have previously upheld convictions under section 1591(a)(1) for conduct other than prostitution. *See, e.g.*, *Flanders*, 752 F.3d at 1330–31 (upholding a conviction under section 1591(a)(1) against a defendant who "used fraud both to recruit and entice [his] victims to travel to Miami and to drug the victims in order to cause them to engage in filmed sex acts" that were then "distributed commercially over the Internet").

Because they are based on an erroneous interpretation of the law, Glenn's arguments about prosecutorial misconduct and improper jury instructions fail. The prosecutor did not commit any misconduct by explaining to the jury that Glenn could be convicted for causing a minor to engage in a commercial sex act without being involved in prostitution. And the district court did not err by refusing to give a jury instruction that conflated a commercial sex act with prostitution.

20

*C. The Prosecutor Did Not Misstate the Law During Closing Argument.*

Glenn asserts that the prosecutor misstated the law with respect to the charge that he traveled with the intent to engage in illicit sexual conduct. 18 U.S.C. § 2423(b). The prosecutor told the jury that a person violates section 2423(b) even if he resides in the country to which he is traveling for illicit sex. Glenn argues that section 2423(b) did not apply to him because he lived in Honduras. He cites *United States v. Pepe*, 895 F.3d 679, 682 (9th Cir. 2018), where the Ninth Circuit vacated a conviction under section 2423(c) because a factual dispute existed as to whether the defendant had relocated to Cambodia and ceased traveling in interstate commerce when he committed his offense.

Contrary to Glenn's assertions, a conviction for violating section 2423(b) does not depend on whether a defendant resided in the foreign country to which he traveled for illicit sex. At the time of Glenn's offense, section 2423(b) provided, "[A] United States citizen . . . who travels in foreign commerce[] for the purpose of engaging in any illicit sexual conduct with another person shall be [punished]." 18 U.S.C. § 2423(b) (effective language Apr. 30, 2003, to Dec. 20, 2018). Under a plain reading of this provision, a crime "is complete as soon as one begins to travel with the intent to engage in" illicit sexual conduct. *United States v. Pendleton*, 658 F.3d 299, 304 (3d Cir. 2011). Nothing in the text of section 2423(b) suggests that

21

the provision is limited to United States citizens who are temporarily visiting a foreign country without residing there.

Glenn's reliance on *Pepe* is misplaced because it addressed a different subsection of the statute. Section 2423(c) makes it a crime for a United States citizen "who travels in foreign commerce" to "engage[] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c) (effective language Apr. 30, 2003 to Mar. 6, 2013). Unlike a crime under section 2423(b), which is complete as soon as a person travels with the intent to engage in illicit sexual conduct, a crime under section 2423(c) "is not complete until a person engages in illicit sex." *Pendleton*, 658 F.3d at 304. So if, at the time a person engages in illicit sex, he has ceased traveling in foreign commerce because he plans to reside in a foreign country, then his conduct does not fall within the terms of section 2423(c). *Pepe*, 895 F.3d at 691. But that limitation does not apply to section 2423(b), the provision under which Glenn was convicted. The prosecutor did not misstate the law about section 2423(b).

### D. Sufficient Evidence Supports Glenn's Convictions.

Glenn argues that insufficient evidence supports his convictions for travel with intent to engage in illicit sexual conduct, 18 U.S.C. § 2423(b), and attempted sex trafficking of Minor G and Minor H, *id.* §§ 1591(a)(1), 1594(a). Although we review the sufficiency of evidence *de novo*, we "view[] the evidence in the light

22

most favorable to the government," and we make "[a]ll reasonable inferences and credibility choices . . . in favor of the government and the jury's verdict." *Garcia*, 405 F.3d at 1269. "We must affirm [Glenn's] convictions unless, under no reasonable construction of the evidence, could the jury have found [him] guilty beyond a reasonable doubt." *Id.*

Sufficient evidence supports Glenn's conviction for traveling from the United States to Honduras on May 19, 2012, with the intent of engaging in illicit sexual conduct with Minor A. 18 U.S.C. § 2423(b). The prosecutor provided evidence that Glenn flew from Miami to Tegucigalpa on May 19, 2012, and that he stayed at the Intercontinental Hotel from May 26 to May 28, 2012. Minor A testified that she had sexual intercourse with Glenn every time they stayed at the Intercontinental Hotel.

Glenn does not dispute this evidence. Instead, he argues that the evidence does not establish "that sex with Minor A was even a small part of [his] motivation" for returning to Honduras. But Glenn testified on his own behalf that he believed that Minor A was his legitimate wife. And he defended himself against the travel-with-intent charge by saying that Minor A "is not a prostitute" and "[i]t's not commercial sex."

The jury could have reasonably found that returning home to his "wife," Minor A, with whom he planned to continue having sex, was one of Glenn's

23

reasons for returning to Honduras. It could have also reasonably discredited Glenn's testimony that Minor A was his legitimate wife. And it could have reasonably found that he engaged in illegal sex with her.

Sufficient evidence also supports Glenn's convictions for attempted sex trafficking of Minor G and Minor H. Minor A testified that she accompanied Glenn and García Velásquez on a trip where they attempted to recruit both girls. Minor G and Minor H also testified about the attempted recruitment, and Minor G identified Glenn to the jury and said that he ate dinner with her and her family. Glenn drove from Comayagua to Minor G's home, brought food to Minor G's family, and ate dinner prepared by Minor G's mother while García Velásquez tried to persuade her to accept a fake job opportunity. Nevertheless, he argues that the evidence does not show that he took a "substantial step" to recruit Minor G and Minor H; if any attempt was made, it was by García Velásquez and Minor A while Glenn waited in the car. But the jury reasonably credited Minor A's testimony that Glenn was more than just a passive observer in the attempt to recruit Minor G and Minor H using the same tactics that had been used on her. Based on this testimony, it reasonably found Glenn guilty of attempted sex trafficking.

### E.  Glenn's Life Sentence is Reasonable.

Glenn argues that his sentence of life imprisonment for his sex-trafficking convictions is substantively unreasonable. He contends that his offenses do not

24

warrant a sentence of life imprisonment because he did not use "force or violence." We disagree.

The district court imposed a reasonable sentence. In addition to the Sentencing Guidelines, the district court considered the statutory factors, including the nature and seriousness of the offenses, the characteristics of the defendant, the need to deter criminal conduct, and the need to protect the public. 18 U.S.C. § 3553(a)(1), (a)(2)(A)–(C). It described Glenn's crimes as "very serious" because they "involv[ed] the sexual abuse of minors." These minors were particularly vulnerable to being deceived because they grew up in poverty and lacked both formal education and experience with modern technology. That Glenn committed many of his crimes while working on behalf of the federal government in a foreign country added to the seriousness of his offenses. The district court explained that Glenn's sentence had to deter these crimes and had to reassure the world that the United States took these crimes seriously. Finally, Glenn's lack of remorse for his crimes left the district court convinced that he would continue to pose a danger to the public if he were ever released from prison. Based on these considerations, the district court did not abuse its discretion by imposing a sentence of life imprisonment.

Glenn unpersuasively argues that the district court should have varied from the Sentencing Guidelines because his convictions did not involve "force or

25

violence." Our precedent suggests the opposite. "Child sex crimes are among the most egregious and despicable of societal and criminal offenses, and courts have upheld lengthy sentences in these cases as substantively reasonable." *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009); *see id.* at 1196, 1221 (upholding as reasonable a 100-year sentence for a defendant who persuaded his minor stepdaughter to engage in illicit sexual conduct and who knowingly possessed child pornography); *United States v. Johnson*, 451 F.3d 1239, 1240–41, 1244 (11th Cir. 2006) (upholding as reasonable a 140-year sentence for producing and distributing child pornography of three boys between the ages of 8 and 16). The district court did not abuse its discretion by imposing a within-guidelines sentence of life imprisonment.

## IV. CONCLUSION

We **AFFIRM** Glenn's convictions and sentence.